# CHARLESTON.

## STATE *v.* BAKER.

### *(GREEN, JUDGE, absent.)

Submitted September 7, 1889.—Decided November 18, 1889.

1. INDICTMENT---QUASHING---GRAND JURY.

   A plea in abatement to an indictment which avers that the prosecuting attorney, of his own motion, without authority of law, went into the room where the grand-jury were sitting, and, in the presence of the grand-jury, examined certain named witnesses, upon whose testimony the indictment was found, and talked in the presence of the grand-jury about the said testimony of said witnesses, and thus unlawfully conspired against the defendant to have and procure the grand-jury to find the indictment, does not present cause for abating the indictment, and was properly rejected.   (p. 321.)

2. JUROR.

   A juror who had not heard the evidence in a criminal cause on a legal investigation, or from witnesses, but had read in newspapers a report of the evidence given on a former trial, and stated that from that he had formed a decided opinion as to the guilt or innocence of the accused, which it would require stronger evidence than he had read to remove, and who stated upon his *voir dire* that he had no prejudice or bias against the prisoner, and that he would regard it a duty, as a juror, under his oath, to discard that opinion, and that he thought he could discard it, and have his mind as a blank, ready to receive the testimony that should be given on the trial, and that, while he would as a citizen entertain that opinion, yet as a juror he would not, but could and would hear and consider the evidence, and render a fair and impartial verdict according to the evidence, uninfluenced by such opinion, and whose statements satisfy the court of his fairness, is a competent juror.   (p. 324.)

3. EVIDENCE.

   A sheriff having a prisoner in his jail charged with murder requests him to deliver his pantaloons to him, not informing him of the purpose for which he desired them. The prisoner, without any protest or objection, delivers him the pantaloons, taking them off for that purpose. The pantaloons are subjected to investigation by experts, to discover the presence or absence of blood-spots on the pantaloons. The State, upon the trial, against the prisoner's objection, by leave of the court, introduces the pantaloons, together with evidence tending to show that

*On account of illness.

such investigation revealed blood-spots on the pantaloons. There is no error in allowing the pantaloons and such evidence to go before the jury. (p. 330.)

4. BILL OF EXCEPTIONS—REVERSAL OF JUDGMENT.

Whereupon a writ of error to a judgment overruling a motion to set aside a verdict and award a new trial on the ground that the verdict is contrary to the evidence, the evidence, not the facts, is certified in the bill of exceptions, this Court will not reverse the judgment, unless, after rejecting all the conflicting oral evidence of the exceptor, and giving full faith and credit to that of the adverse party, the decision of the trial-court still appears to be wrong. *State* v. *Flanagan*, 26 W. Va. 116. (p. 336.)

5. EVIDENCE—REVERSAL OF JUDGMENT.

A case in which, upon circumstantial evidence, a verdict of murder in the first degree is found, and this Court refuses to reverse the judgment based upon it.

*W. W. Arnett, J. M. Cook, W. D. Moore* and *J. R. Donehoo* for plaintiff error.

*Attorney-General Alfred Caldwell, J. A. Hutchinson* and *W. J. Huff* for the State.

BRANNON., JUDGE :

Van B. Baker was indicted in June, 1887, in the Circuit Court of Hancock county, for the murder of Mrs. Drusilla McWha. He demurred to the indictment, and his demurrer was overruled. He tendered a plea in abatement, which was rejected by the court. He then pleaded not guilty. After a trial in Hancock, and a new trial granted, the case was removed to Brooke county. When his trial came on there he objected to certain jurors for incompetency, whom the court accepted as competent. His trial resulted in a verdict of guilty of murder in the first degree, and finding that he be confined in the penitentiary. He moved the court to set aside the verdict and grant him a new trial, on the ground that it was contrary to the evidence, and the admission and rejection of certain evidence, and erroneous instructions. No instructions appear in the record, and no assignment is made as to them. The court overruled the motion for a new trial, and on the 27th of December, 1888, rendered judgment that the prisoner be confined in the penitentiary during his life; and to that judgment he obtained a writ of error.

*Did the court err in rejecting the plea in abatement?* It avers that the prosecuting attorney, of his own motion, without authority of law, went into the grand-jury room while the grand-jury was in session, and there, in the presence of the grand jury, examined certain witnesses, upon whose testimony the indictment was found, and there talked in the presence of the grand-jury about said testimony of said witnesses, and thus unlawfully conspired against the defendant to have said grand-jury find said indictment. Will the presence of the prosecuting attorney before a grand-jury vitiate an indictment? Our Code of 1868 (chapter 120, § 5) provided that "it shall be the duty of every prosecuting attorney in this State to go before the grand-jury whenever, in his opinion, the public interest will be promoted thereby, or when called upon by the foreman to do so, to aid them with his advice and assistance in the discharge of their official duties. But he shall not be present when any vote is taken upon the finding of an indictment or presentment." This statute has been repealed, and for that reason it is claimed the legislature did not intend prosecuting attorneys to go before grand-juries. In the *first* place, this section made it the duty of prosecuting attorneys to do so, whereas before it was not imperative; and, *secondly*, though the legislature may have so intended, it could only express its intent by enactment. This repeal left the subject as it was at common law. How is it at common law?

The judges of England, in 1660, in the proceedings against the regicides of King Charles I., (5 State Tr. 947) resolved that any of the king's counsel might privately manage the evidence before the grand inquest, in order to the finding of the bill of indictment. So in the case against Hardy and others (24 State Tr. 199) for treason, in 1794, the solicitor for the crown went before the grand-jury. According to Sir JOHN HAWLES, in Colledges' Case, in 1681, the practice had long prevailed. 8 State Tr. 723. 1 Chit. Crim. Law, 260, states that it is not unusual, except in the king's bench, where the clerk of the grand-jury attends, to permit the prosecutor to be present during the sitting of the grand-jury, to conduct the evidence on the part of the crown. So on indictment for treason, where the sovereign is immediately

interested, any of the king's counsel may attend for the same purpose, as he can not prosecute in person. 1 Bish. Crim. Proc. § 861, says the practice is not uniform in all the states, but in the greater number the state's attorney is with the grand-jury, when not deliberating on their finding, assisting in examining witnesses, and advising on questions of law. In 9 Amer. & Eng. Cyclop. Law, 16, tit. "Grand Juries," the rule is laid down that "during the taking of the testimony no one besides the witnesses is permitted to be present, except the prosecuting attorney or his assistants. During the deliberations and vote of the grand-jury, no person not a member of the grand-jury may be present. An indictment may be set aside if the rule is violated."

Mr. Justice NELSON, in *U. S.* v. *Reed*, 2 Blatchf. 435, said: "It is the uniform practice in the Federal and State Courts for the clerk and assistant of the district attorney to attend the grand-jury, and assist in investigating the accusations presented before it. That has been the practice, to my knowledge, without question, ever since I have had any connection with the administration of criminal justice. * * * We can not at this late day overturn a uniform practice, that has been settled for so long a time. * * * But, if any abuse has been committed by him, or by any other person, it is a proper subject for investigation by the court."

In Justice FIELD's formal charge as to the powers and duties of grand-juries, in 2 Sawy. 678, he says: "The district attorney has the right to be present at the taking of testimony before you, for the purpose of giving information or advice touching any matter cognizable by you, and may interrogate witnesses before you; but he has no right to be present pending your deliberations on the evidence. When your vote is taken upon the question whether an indictment shall be found, or a presentment made, no person besides yourselves should be present."

In *State* v. *Whitney*, 7 Or. 386, an assistant attorney was before the grand-jury; and this was held not a cause for setting aside the indictment, or reversing the judgment. In *Shattuck* v. *State*, 11 Ind. 473, it was held that the prosecuting attorney may attend the grand-jury, examine witnesses, and advise the jury of matters of law. See, also, Thomp. & M.

Juries, §§ 630, 632, and *Ex parte* Crittenden, Hemp. 176, and Whart. Crim. Law, §§ 404, 495.

Davis, in his Criminal Law, says : "The practice in Massachusetts is for the prosecuting officer to open the case, commence the examination of each witness, and meet any question as to the law of the case that may be given him ; but during the discussion of the question it is his duty to remain perfectly silent, unless his advice or opinion in a matter of law is requested. The least attempt to influence the grand-jury in the decision upon the effect of the evidence is an unjustifiable interference, and no fair and honorable officer will ever be guilty of it. It is very common, however, for some one of the grand-jury to request the opinion of the public prosecutor as to the propriety of finding the bill ; but it is his duty to decline giving it, or even any intimation on the subject, but in all cases to leave the grand-jury to decide, independently, for themselves."

Undoubtedly, this power is, in many cases of complication, important for the public interest, and, when exercised by conscientious prosecutors, according to these principles, can not hurt the accused, but when improperly exercised is a weapon of danger. Now, this plea in abatement does not aver at what stage of the grand-jury proceedings the attorney was present : or that he was present during deliberation or vote ; or that he made any comment on the credit or effect of the evidence, or even on the law ; or that he urged the finding of the indictment. It does say that he "talked in the presence of said grand-jury about the testimony of said witness.' This may be so, and yet not improper. In what respect did he talk of it—about its weight, or credit, or its mere admissibility, or the law pertinent to it, or during the deliberation or vote upon the indictment ? The plea does not say. The plea should show that this "talk" was contrary to law. It does say, "and thus he unlawfully conspired against him, to have and procure said grand-jury to find said indictment." The word "thus" remits us to the "talk" before the grand-jury ; and we do not, as just stated, know whether that talk was improper, the manner of conspiring being limited by the word "thus" to such talk. So far as the plea informs us, the only party to the conspiracy, except by inference, was the

prosecuting attorney. If it was with the whole or part of the grand-jury, it does not say so. A plea in abatement should be certain, not inferential. So there was no error in rejecting this plea.

*Did the court err in overruling defendant's objection to the juror Reed?* There have been many cases in Virginia upon the competency of jurors in criminal cases on account of preconceived opinions. *Lithgrow's Case,* 2 Va. Cas. 297; *Sprouce's Case,* Id. 375; *Poore's Case,* Id. 474; *Pollard's Case,* 5 Rand. (Va.) 659; *Hughe's Case,* Id 655; *Mendum's Case,* 6 Rand. (Va.) 704; *Brown's Case,* 2 Leigh. 769; *Osiander's Case,* 3 Leigh. 780; *Hendrick's Case,* 5 Leigh. 707; *Maile's Case,* 9 Leigh. 661; *Moran's Case,* Id. 651; *Armistead's Case,* 11 Leigh. 657; *McOune's Case,* 2 Rob. (Va.) 771; *Heath's Case,* 1 Rob. (Va.) 736; *Hailstock's Case,* 2 Gratt. 564; *Epes's Case,* 5 Gratt. 676; *Smith's Case,* 6 Gratt. 696; *Smith's Case,* 7 Gratt. 593; *Clore's Case,* 8 Gratt. 606; *Wormeley's Case,* 10 Gratt. 658; *Montague's Case,* Id. 767; *Jackson's Case,* 23 Gratt. 919; *Little's Case,* 25 Gratt. 951; *Cluverius's Case,* 81 Va. 787.

In Jackson's Case, *supra,* MONCURE, P., said: "There is no question, perhaps, about which there has been more apparent conflict of decision in this state, or in regard to which it is more difficult to derive from our many casses on the subject any definite rules which will apply to all cases that may arise. The object of the law is to secure to every man who is charged with a criminal offence a trial by an impartial jury; and this rule has been established by the cases, if no other: that if a *venire* man has formed—and, still more, if he has formed and expressed—a decided or substantial opinion as to the guilt or innocence of the accused, no matter upon what ground it was formed, whether from having heard the evidence on some former trial or examination, or from mere rumor, or otherwise, he is an incompetent juror to try the case; and if, on the other hand, his opinion be merely hypothetical, he is not incompetent." He further says: "It would be dangerous to lay down a rule; and no case has ever decided that a *venire* man, who has formed an opinion from accounts received from witnesses out of court, and still less from accounts re-

ceived from others, as to statements made by witnesses in or out of court, is therefore necessarily an incompetent juror."

It is useless to attempt to analyze these many cases. It is clear that they all hold that to disqualify a juror the opinion must be decided and substantial. So our court has said the opinion must be "deliberate and decided." *Thompson* v. *Updegraff*, 3 W. Va. 629. It makes no difference, if the opinion is decided, whether it has been expressed or not. *Armistead's Case, supra.* Some cases hold that if the opinion is decided, no matter what its source, whether from evidence heard on a former trial, conversation with witnesses or common report, even though the juror say that he is without prejudice, and that his opinion would yield to the evidence, and he would give the accused a fair trial, and has no doubt of his ability to do so, still he is not competent. *Armistead's Case, Sprouce's Case*, and perhaps *Heath's Case, supra.* Other cases hold that if such opinion is based, not on evidence heard on a trial, but on common report, though the juror says that on what he heard his opinion is decided, yet if he says that he is without prejudice, and that his opinion will yield to evidence, and he can discard it, and give the accused a fair trial, such opinion is hypothetical, and does not disqualify. *Maile's Case, Moran's Case, Epes's Case, Clore's Case, Wormley's Case*, and the two *Smith Cases, supra.* These cases overrule in number and reason the former cases.

In the late Case of *Jackson*, 23 Gratt. 919, it is held that if a juror has formed, and, still more, expressed, an opinion, no matter on what ground, whether from hearing a former trial, or rumor, or otherwise, he is incompetent; but if the opinion is hypothetical, if the opinion is from hearing the evidence on a former trial or examination, it would be difficult, if not impossible, to regard the opinion otherwise than as decided or substantial, and he would be generally, not always, incompetent, even though he might think he could give the accused an impartial trial; whereas, if the opinion be based on mere rumor, the presumption, in the absence of evidence to the contrary, is that such opinion is merely hypothetical, and will be so considered, even though the juror speaks of it as a decided or substantial opinion, if he says he has no prejudice, and can give the accused a fair and

impartial trial. But if the court be satisfied, from the juror's statement or otherwise, that the opinion is in fact decided or substantial, he will be incompetent. *Pollard's* and *Mendum's Cases, supra,* were cases where jurors heard part of the evidence on legal examination, and formed opinions; but, because they stated that they were without prejudice against the prisoner, and could give him a fair trial, without regard to such opinion, and uninfluenced by it, they were held competent.

Now, the case in hand is one where Reed did not hear any of the evidence on a legal examination; nor yet was his opinion formed on mere hearsay or rumor, but on a newspaper report of the evidence on a former trial, from which he had a decided opinion, which it would require evidence to remove stronger than he had read, but he said that he would regard it his duty as a juror to discard it, and could and would do so; and render a fair verdict according to the evidence; and he seemed to be a man of intelligence, and to speak frankly as to his condition of mind, and emphatically as to discarding the opinion and rendering a fair verdict. What shall be the decision in such a case?

In these days of unlimited newspaper circulation, when, by means of stenographic reports, details of the evidence in important trials are published broadcast over the land, and read by the intelligent and reading portion of the community, by those most competent to sit upon juries and give intelligent verdicts, is an opinion grounded on such reading to exclude the newspaper reader from the jury seat in any subsequent trial of the case? Even though a juror upon his oath, when assuming his solemn duty, says, and the court is satisfied, that he is without bias in the cause; that he will as a juror discard and disregard such preconceived opinion, and give the case a fair and impartial trial according to the evidence, uninfluenced by such opinion—is he to be rejected? I think not. To do so would put a premium on ignorance, and a discount on reading and intelligence; and the unbending application of such a rule would practically disable courts from securing juries of adequate capacity to fitly decide grave and momentous causes. It may be questioned whether, generally, an opinion formed simply from a news-

paper report of a trial is of that decided, substantial character contemplated by the law disqualifying jurors for opinions. Such cases belong, as President MONCURE says in *Jackson's Case*, 23 Gratt. 928, to an intermediate class, between opinions formed by a man who is present at the trial and hears the full proceedings, and those based on mere report; and no unbending rule can be laid down, but each case must rest on its circumstances.

Judge LOMAX in *Clore's Case*, 8 Gratt. 620, says: "There is in every bosom an irrepressible casuistry, ever ready to exercise the judgment upon every representation of criminalty, more especially in crimes of deep atrocity, such as homicide, which seems instinctively to rouse all the faculties of the mind and the sensitiveness of the soul. Upon such occasions the minds and the feelings of none are more apt to be roused into the formation of opinions upon what they may have heard that is material in the case than those who are the most intelligent and discreet and upright, and, at the same time, the most discriminating, such as are, of all the community, the most fit to sit in trial upon the criminal. They may, upon the intelligence which they have received, have formed opinions on the case, and even strong ones; but they were formed upon the hypothesis of the case as it was presented to them. If they are disqualified as jurors, then those best qualified will be excluded from passing between the commonwealth and the prisoner in cases where vindication of guilt or innocence will be most vital. Courts should be careful in laying down rules as to qualifications of jurors which will throw jury trials and the administration of criminal justice into the hands of the most senseless and ignorant, and least competent to pronounce a just and legal verdict."

In *Moran's Case*, Judge SUMMERS said: "When opinions have not impressed the mind with strong and decided convictions, by which the justness and fairness of the juror's decision upon the evidence may be influenced, we think that no disqualification is produced. Sustaining challenges to jurors for favor, on slight grounds, tends to place the administration of public justice in the hands of the most ignorant and least discriminating portion of the community, by which the safety of the accused may be endangered, and the proper

administration of the laws put to hazard, and we are therefore not disposed to enlarge the grounds of challenge beyond those properly deducible from the cases heretofore decided."

Such, it seems to me, are the reason and public policy on this subject. How does it stand on authority? In *Smith's Case*, 6 Gratt. 696, a juror stated "that he had formed and expressed a decided opinion, founded on a report of the evidence before the mayor, published in the papers, but not such an opinion as would influence his mind, if accepted as a juryman; that the opinion so formed would naturally be recalled to his memory; but that he would be governed solely by the evidence which might be given in court." He was held competent. And in *Smith's Case*, 7 Gratt. 593, it was held that "the entertaining a decided opinion of the prisoner's guilt, formed on the testimony as published in the newspapers, is not a valid objection to a juror, if he thinks he can discard his opinion, and that it would not influence his judgment, and that he could give the prisoner a fair trial, according to the law and the evidence submitted to the jury."

In *Schnelle's Case*, 24 W. Va. 780, a witness had read the evidence in a newspaper, and formed an opinion. The president of this Court, (JOHNSON) in delivering its opinion, said: "Here is a man, sworn as a juror, who had read the newspaper reports of the homicide, and the evidence in the preliminary examination of the charge against the prisoner, and who had, from such reports and evidence, formed and expressed an opinion as to the guilt or innocence of the accused, but who, by prompt answers to questions, says he has no bias or prejudice against the prisoner, and the opinion so formed will not influence him in the trial of the issue. Why should he be excluded from the jury? Merely because, from what he had heard of the case, from what he had read, he had formed and expressed an opinion?   *   *   *   Such a rule would put a discount on intelligence, and a premium on ignorance. The human mind is so constituted that when it receives information on any subject it will at once form a hypothetical opinion upon such information. The well-balanced mind will not be prejudiced by such an opinion, if afterwards the information on which it was based is found to be incorrect, or only partially correct. The mind that can

thus discriminate, and not suffer itself to be prejudiced by impressions formed on a partial knowledge of the facts, is the kind of mind that ought to be possessed by every juror who tries an issue where the life or liberty of a citizen is involved. It seems to me that the juror Ballard possessed such a mind. He answered the questions candidly, frankly, and promptly, and showed that he had no bias or prejudice, notwithstanding he had read the evidence in the newspapers, and had formed and expressed an opinion." Another juror in the same case was held disqualified who had formed an opinion based on newspaper report, because he could not say his mind was free from prejudice, and that his formed opinion would not influence him.

In this *Schnelle Case* this Court advanced somewhat beyond Virginia decisions, and held that "a previously formed and expressed opinion of the guilt or innocence of the accused is not of itself sufficient to disqualify a proposed juror. If such a proposed juror shows to the satisfaction of the court, in his examination on his *voir dire*, that, notwithstanding a previously formed and expressed opinion of the guilt or innocence of the accused, his mind is free from bias and prejudice, and the contrary is not shown, he is a competent juror. * * * But, if a proposed juror, on his *voir dire*, admits that he has formed and expressed an opinion as to the guilt or innocence of the accused, and halts and hesitates as to his then condition of mind, and can not say that his mind is free from bias and prejudice, and can not say that the previously formed opinion will not influence his verdict, he is an incompetent juror." Thus, this late case in this Court makes the test of qualification not merely the existence of a previously formed opinion, but whether or not the mind of the juror is at the time of his examination free from bias and prejudice, and its capacity to act and render a verdict uninfluenced by such an opinion. The three cases last cited rule this case, and under them Reed was a competent juror. Here it should be added that in all cases great weight is justly due in an appellate court to the opinion of the court before whom *venire* men are questioned and examined in regard to their competency. *Montague's Case,* 10 Gratt. 767; opinion in *Cluverius' Case,* 81 Va. 787. "That court which sees, hears

and knows the *venire* man can much better ju-lge of his fitness to be a juror than we can." *Jackson's Case*, 23 Gratt. 920. Reed was not one of the jurors that tried the prisoner. As to other jurors objected to by prisoner, the record discloses no disqualification, and none is specified as to any of them, or insisted on in the briefs.

*Is the indictment good?* It contains one count, in the form prescribed by section 1, c. 144, Code 1887. Counsel for defendant urges that it is not such an indictment as is required by constitutional provisions, and that the statute authorizing it is void. In *Schnelle's Case*, 24 W. Va. 767, *Smith's Case*, Id 815, and *Flanagan's Case*, 26 W. Va. 116, this statute and form of indictment for murder under it, have been held valid. In *Schnelle's Case* the discussion rested on that provision of the bill of rights entitling the accused to be fully and plainly informed of the character and cause of the accusation against him. Brief of counsel in this case suggests that our statute and form of indictment are invalid under sec. 4, art. III, of the State constitution, probably referring to that clause which provides that no person shall be held to answer for treason, felony, or other crime, unless on presentment or indictment; and sec. 10, art. III: "No person shall be deprived of life, liberty, or property without due process of law, and the judgment of his peers." We do not see that any of these have been violated by this act and the form under it. We are asked to reconsider the decision on this point in *Schnelle's Case;* but we regard that case as correct, and see no reason for re-opening the question. The brief also refers to articles 4, 5, and 6 of amendments to the constitution of the United States. It is well settled that the first ten of these amendments were not intended to limit the powers of the states in respect to their own people, but to operate on the national government only. *Spies* v. *Illinois*, 123 U. S. 131, (8 Sup. Ct. Rep. 21, 22).

*Is there any error in allowing the state to use in evidence the pantaloons of the prisoner, which the state claimed showed blood spots?* I think there is not. It is true that our constitution provides that no person, in any criminal case, shall be compelled to be a witness against himself; but it has not been violated in this case. The sheriff asked the prisoner, while

he was in jail, for his pantaloons; and he, without objection, took them off, and handed them to the sheriff. There was no force or compulsion used, no resistance by the prisoner, but a tacit consent.

Several cases are cited by defendant's counsel to support this exception. In *State* v. *Jacobs*, 5 Jones (N. C.) 259, the court says: "A judge has not the right to compel a defendant in a criminal prosecution to exhibit himself to the inspection of the jury, for the purpose of enabling them to determine his *status* as a free negro." In *Day* v. *State*, 63 Ga. 667, the court held: "Evidence that a witness forcibly placed defendant's foot in certain tracks near the scene of the burglary, and that they were of the same size, is not admissible. A defendant can not be compelled to criminate himself by acts or words." The court says: "No one can by force compel another, against his consent, to put his foot in a shoe track, for the purpose of using it as evidence against him." In *Blackwell* v. *State*, 67 Ga. 76, it was held that, the place where a prisoner's leg was amputated being a material point, it was error to require him to stand up and show his leg, so that a witness could see and describe it to the jury. In all these cases, except one, there was compulsion—an order by the court during the trial; and in one, out of court, force used against the stubborn resistance of the prisoner. In another case relied on for the prisoner, *People* v. *Mead*, 50 Mich. 228 (15 N. W. Rep. 95) a defendant on the witness stand was asked to try on a shoe, which he did, without objection. He was then asked to measure it, and he objected, and his objection was overruled. Judge COOLEY, in delivering the opinion, said: "Had there been any objection to respondent's trying on the shoe, the court would have had no authority to require it," and then ruled that the simple measurement was no error. This is authority to show that the act of the sheriff, especially as it was out of court, without objection by the defendant could not render the evidence inadmissible. In *People* v. *McCoy*, 45 How. Pr. 216, evidence of a forcible examination of a female, to ascertain whether she had been delivered of a child, was held inadmissible. Decisions in other states have been made justifying compulsory *profert* or

exhibition of marks or other peculiarities of the person, not observable without it.   In *Ah Chuey's Case*, 14 Nev. 79, the court compelled Ah Chuey, against his protest, to roll his up sleeve, and show tattoo marks on his arm.   In *State* v. *Garrett*, 71 N. C. 85, at the coroner's inquest, the coroner .compelled the prisoner to unwrap the hand she stated had been burned, and there was no sign of a burn ; and the court held that on the trial the condition of the hand, though she was ordered by the coroner to unwrap it, was admissible. In *State* v. *Prudhomme*, 25 La. Ann. 523, tracks of the murderer were found near the scene, and the prisoner was on the trial forced to take his feet from under a chair, and exhibit them, so that a witness could make a comparison.   It was held no error.   In *Walker* v. *State*, 7 Tex. App. 245, the state was allowed to prove that the examining magistrate had compelled the prisoner to make his foot-prints in an ash-heap, and that they corresponded with those at the scene of the murder.

In *State* v. *Graham*, 74 N. C. 646, the arresting officer compelled the prisoner to put his foot in a track near where the larceny was committed, and testified as to the result of the comparison ; and it was held that the evidence was not procured by duress, and was admissible.   The judge delivering the opinion says :   "If an officer   *   *   *   had no right to make the prisoner show the contents of his pocket, how could the broken knife, or the fragment of paper corresponding with the wadding have been found ?   If, when a prisoner is arrested for passing counterfeit money, the contents of his pockets are sacred from search, how can it ever appear whether or not he has on his person a large number of similar bills, which, if proved, is certainly evidence of the *scienter?*   If an officer sees a pistol projecting from the pocket of a prisoner arrested for a fresh murder, may he not take out the pistol, against the prisoner's consent, to see whether it appears to have been recently discharged ?   Suppose it to be a question as to the identity of a prisoner— whether a person whom a witness says he saw commit a murder—and the prisoner appears in court with a mask or veil over his face.   May not the court order its removal, in order that the witness may say whether or not he was the

person whom he saw commit the crime? Would the robber whose face was marked with the wards of a key have been allowed to conceal his identity by wearing a mask during his trial? We conceive that these questions admit of but one answer, and that is one consistent with the general practice."

It is not necessary or proper for us, in this cause, to indicate any opinion upon the conflicting authorities as to the compulsory exhibition of a prisoner's person on the trial, or elsewhere. It is here noted that even the dissenting judge in *Ah Chuey's Case*, whose opinion counsel for Baker cites, makes a distinction between evidence obtained by compulsion in court during trial and out of court. He says: "At a criminal trial, courts can not take notice of the manner of obtaining evidence out of court. If it is competent and pertinent to the issue, it will be received." "Those arresting a person are bound to take from his person any articles which may be of use as proof in the trial of the offence," according to Wharton, (Crim. Pl. & Pr. § 60) and Roscoe, (Crim. Ev. 211.) Even if a confession be extorted unlawfully from a prisoner, and in it he indicates where a corpse or stolen property, or other thing connected with the crime, may be found, and they are found where he stated, some authorities hold that both the whole confession and the fact that the corpse or articles were found where the prisoner in his confession indicated are admissible; but all agree that it may be proven that the corpse or articles were found, and found at a certain place. *Frederick's Case*, 3 W. Va. 695; and opinion in *Douglass's Case*, 20 W. Va. 770; Whart. Crim. Ev. § 678; 1 Greenl. Ev. § 231.

In view of the great importance of this case, I have deemed it proper to examine patiently and carefully the authorities cited by prisoner's counsel and others touching this point; and as a result we are clearly of opinion that no error was committed in admitting the pantaloons, and the evidence tending to show blood upon them. A decision of this Court confirms us in this conclusion. *Douglass's Case*, 20 W. Va. 770. It was a murder case. There the prisoner told his counsel where the pistol could be found; and he found it, and placed it in his trunk, at the hotel. The

prosecuting attorney and hotel-keeper went to this counsel's room in his absence, opened his trunk, and took out the pistol, examined and replaced it in the trunk. The next day the prosecuting attorney, with others, went to the room of the prisoner's counsel to examine the pistol and told him their mission. He told them that the pistol was a privileged communication from his client, and told them it would be produced in court. He showed it to them, but refused to give it to them. A few days afterwards the prosecuting attorney went to the room of this counsel, asked to examine the pistol, and it was shown him; and he declined to return it to the prisoner's counsel, who protested against the prosecuting attorney's keeping it, but finally consented that a third person should keep it until court. This Court held that, though search for the pistol was made in the counsel's absence, and unlawfully, whether the suspicion as to its whereabouts arose from his improper disclosures of what he had learned from his client or not, the persons finding it could produce it before the jury, and prove the fact that they found it in the trunk of prisoner's counsel. The court further held that the state had a right to prove that the pistol wherewith the murder was done was found, and where found, "though found in consequence of statements as to where it was to be found, extorted improperly from the prisoner, or improperly made by the attorney of the prisoner, in violation of his duty to keep secret professional communications made to him by his client."

We come now to the merits. *Did the Circuit Court err in refusing to set aside the verdict and grant a new trial?*

Here we must not forget certain principles of well-settled law. (1.) The constitutional law of the land in which we live guarantees to the accused a trial by jury, in declaring that "no person shall be deprived of life, liberty, or property without due process of law, and the judgment of his peers;" but, on the other hand, when once a jury of his peers has pronounced judgment upon him, it comes with telling force, and the law accords to it a peculiar respect. "A new trial, asked on the ground that the verdict is contrary to the evidence, ought to be granted only in case of a plain deviation from right and justice, and not, in a doubtful case, merely

because the court, if on the jury, would have given a different verdict." "Where a case has been fairly submitted to a jury, and a verdict fairly rendered, it ought not to be interfered with by the court, unless manifest wrong and injustice has been done, or unless the verdict is plainly not warranted by the evidence or facts proved." "Where some evidence has been given which tends to prove the fact in issue, or the evidence consists of circumstances and presumptions, a new trial will not be granted merely because the court, if upon the jury, would have given a different verdict. To warrant a new trial in such cases, the evidence should be plainly insufficient to warrant a verdict. And this restriction applies *a fortiori* to an appellate court." *Sheff* v. *City of Huntington*, 16 W. Va. 307; *Grayson's Case*, 6 Gratt. 712; *Blosser* v. *Harshbarger*, 31 Gratt. 214; *Cooper's Case*, 26 W. Va. 338; *Pryor's Case*, 27 Gratt. 1009; *McDaniel's Case*, 77 Va. 281. In *Cooper's Case, supra,* in delivering the Court's opinion, Judge SNYDER very pointedly and aptly said : "In Virginia and this State the courts have always guarded with jealous care the province of the jury. If the question depends upon the weight of testimony, or inferences and deductions from the facts proved, the jury and not the court, are exclusively and uncontrollably the judges. This conclusion is based upon the well-established rule that the jury are the sole judges of the evidence, the credibility of all admissible testimony, and the inferences from the facts and circumstances proved. *State* v. *Thompson*, 21 W. Va. 741; *State* v. *Betsall*, 11 W. Va. 703." But where a verdict is manifestly contrary to or without sufficient evidence, it should be set aside. *State* v. *Foster*, 21 W. Va. 767; *Wandling* v. *Straw*, 25 W. Va. 692.

(2.) After the trial court has approved a verdict by refusing to set it aside, an appellate court should for that reason exercise extreme caution in reversing the trial court. The trial judge and the jury have seen the witnesses face to face— their expressions of countenance, demeanor, tone of voice, manner of delivery of their evidence, the manifold circumstances attending the trial—and possess far better means of passing upon their credit than we, remote from the scene of the transaction, and confined simply to the re-

corded evidence. *Black* v. *Thomas*, 21 W. Va. 709. "This restriction applies *a fortiori* to an appellate court; for in that court there is superadded the weight which must always be given to the verdict of a jury, fairly rendered, that of the opinion of the judge who presided at the trial, which is entitled to peculiar respect upon the question of a new trial." *Brugh* v. *Shanks*, 5 Leigh. 598; opinion in *Blosser* v. *Harshbarger, supra.* In *Lawrence's Case*, 30 Gratt. 845, the judges of the Court of Appeals of Virginia ruled that, though they would have acquitted the prisoner, had they been on the jury, or granted a new trial had they presided at the trial, yet as an appellate court they could not do so. "When a case depends upon the tendency and weight of evidence, and the jury and the judge who tried the cause concur in the weight and influence to be given to the evidence, it is an abuse of the appllate powers of this Court to set aside a verdict and judgment because the judges of this Court, from the evidence as it is written down, would not have concurred in the verdict." So held in *Hill's Case*, 2 Gratt. 594; so in *Seibright's Case*, 2 W. Va. 591. Though, contrary to the English courts, we in this State hold it to be within the power of an appellate court to set aside a verdict, it is only where it is plainly against the evidence, or without evidence. *Hill's Case, supra; McCune's Case*, 2 Rob. (Va.) 771. "Where, upon evidence merely circumstantial, the jury has found the prisoner guilty, and the court which tried the case has refused to grant a new trial, the verdict will not be disturbed by the general court, even though, in the opinion of that court, the evidence do no amount to very strong and clear proof," was held by the sixteen judges of the general court of Virginia in *McCune's Case, supra.*

(3) And there is another rule of law which we must not forget. It was held by this Court in the case of *State* v. *Flanagan,* 26 W. Va. 116, following numerous cases therein cited. That rule is: "Upon a writ of error to a judgment overruling a motion to set aside a verdict, and to award a new trial, on the ground that the verdict was contrary to the evidence, and the evidence and not the facts proved is certified in the bill of exceptions, the appellate court will not reverse the judgment unless, after rejecting all the conflicting parol evidence

of the exceptor, and giving full faith and credit to that of the adverse party, the decision of the trial court still appears to be wrong. See *Black* v. *Thomas*, 21 W. Va. 709." The Virginia court of appeals, in several late cases, has gone fully to this extent. *Dean's Case*, 32 Gratt. 912; *Read's Case*, 22 Gratt. 924; *Proctor* v. *Spratley*, 78 Va. 254. In *Vaiden's Case*, 12 Gratt. 717, it was even held that where the evidence is certified, instead of the facts, the appellate court will only look to the evidence introduced by the commonwealth; and in reviewing the judgment the appellate court will not reverse it on the ground that there is a doubt of its correctness, but it must be satisfied that the evidence is plainly insufficient to warrant the verdict.

Thus it is seen how narrow is the function of this Court on the point of granting a new trial for such cause. In this case the facts are not certified, only the evidence, in the form of questions and answers, as taken down by a stenographer, except a few documents, containing the evidence of more than 100 witnesses, covering more than 900 pages of printed record.

### SYNOPSIS OF EVIDENCE.

Mrs. Drusilla McWha, aged about 70, and her daughter, Eliza Baker, aged about 40, resided together at Holliday's Cove, in Hancock county, in a frame building, one and a half stories high, on a bluff, the premises fronting on the Steubenville turnpike; the house, about 100 feet from it, surrounded by trees. In the rear of the house the premises extend back, including a stable and a young and old orchard, the premises in that direction being secluded. On the southwest side is a common, the school-grounds. The nearest neighbor is two or three hundred yards distant. The house is isolated. There was a small porch, including the hall door, and a window on each side of it. A hall runs from front to rear of the house. On the right of it, as you enter, is Mrs. McWha's sleeping-room, entered by a door from the hall; and in the rear of her room, communicating with it by a door, is the kitchen. Across the hall from Mrs. Mc-Wha's room is the parlor, and in rear of it, in the corner, communicating with it by a door, is a spare bed-room; and

across from the kitchen, in rear of parlor, was Mrs. Baker's sleeping-room. The outer doors are three—a front and rear hall-door, and one from the kitchen. Between nine and ten o'clock in the forenoon of Tuesday, May 10, 1887, Baker is seen standing in the yard, hallooing: "Murder! Murder! For God's sake, come quickly!" Neighbors rush to the premises, enter the front door, and find the door of Mrs. McWha's room open; and lying on its floor, dead and rigid, are Mrs. McWha and her daughter, Mrs. Baker. The mother lies on her back; and on top of her, across her breast, lies the daughter, lying somewhat diagonally with her mother, her face and breast across her mother's breast, on the mother's breast, her head extending a little over her mother's body; their hair disheveled, falling over their heads to the floor, and stiff with blood. The bodies had on each a waist and skirt, commonly worn under the dress, feet bare, night-caps on wrong side out, and the back parts in front. A few feet off is Mrs. Wha's bed, tossed up; the lower end of the tick thrown towards the head, doubled from the foot up; pillows and bolsters out of place—rather under the part thrown up. A night-gown is found, rolled up. The draw-blinds of the two front windows of Mrs. McWha's room are drawn clear down. There is no other window in this room, no transom over the door; and the room is very dark, so that when the door is closed a light has to be used to examine the bodies. A tub, with water in it, is between the feet of the two bodies. In it are an axe; an iron bolt, with a square head; a car-coupler; a green dress, worn by Mrs. Baker, and the skirt and waist of another dress, worn by Mrs. McWha; a corset; an apron; a rag; a pair of stockings, one of them pulled wrong side out, except the foot—which was not pulled out or turned in; two night-caps, tied together, filled with blood, wadded up; a handkerchief; a piece of muslin, very bloody, appearing as if filled with blood, as it was rolled up, "sopped up"—very bloody, not clots, but having as much as it could hold. One sleeve of each dress had been pulled off, and turned wrong side out. The water in the tub was very bloody. There were no blood clots on the dresses, but they were blood-stained. A bunch of long hair from a woman's head was found on the green dress   The axe, when drawn out of

the tub, was dripping with bloody water, and had blood adhering to it.

The examining physician, Dr. Morris, found six or seven wounds on the head of Mrs. McWha, a contused wound on the neck, apparently made with the bolt, three lacerated wounds back of the ear, one incised wound across the right temple, one wound in the left temporal region, and one incised wound in the back of the neck. The wounds on the left side of her head, back of the ear, and on the temple, were apparently made with the bolt. The wound on the neck fits the bolt. The whole bolt-head fits into the wound on the temple. The wound in the left temporal bone crushed through the skull, and cut the temporal artery. On Mrs. Baker's head was an incised wound on the left temporal, which crushed the skull; two of the same character on the right temporal bone. The one on the right crushed through the skull table. An incised wound almost severed the head from the body on the back of her neck, just below the base of the brain. These incised wounds on the backs of the necks were cut straight across. A physician thought the bolt wound on Mrs. McWha were inflicted during her life; the cut wounds on the back of the neck, after death. A witness said no wound had been made with the car-coupler. The cut wound on the back of her neck had not bled. The physician said there was no blood on Mrs. McWha's body from her daughter, and that there was no blood in Mrs. Baker's body, it being livid, bleached; but Mrs. McWha had not bled very much.

In Mrs. McWha's room was a good deal of blood scattered around the bodies on the carpet, and on the wall; on one of the windows, many small spray dots spattered about; and a spot on the ceiling. In the kitchen was blood everywhere—some on the leaf of the table, where there was appearance of effort to wash it off. There were pools of blood in the kitchen. There was the profile of a person that had been lying on the back on the floor; and blood had effused and run about it, and thus marked the shape of the body or shoulders on the floor. A witness said that it was so distinct that anybody could see it, and that the body must have laid there long enough for blood to collect about it. There

was a blood mark on the jamb of the door between the kitchen and Mrs. McWha's room, about two feet up; and on the step between the kitchen and Mrs. McWha's room was blood, which appeared to have been wiped off the step, and trickled down from the top of the step on the riser. There was a trail of blood spots from the kitchen to the bodies. Hanging up in the kitchen was found a sun-bonnet, with much blood on it. Mrs. McWha's shoes were under her bed; her stockings folded up in them, as usual, with no blood on them. In Mrs. Baker's sleeping-room her shoes were found under her bed, with very much blood on them, plainly to be seen; and they appeared to have been wiped off, leaving streaks of blood.

Dr. Morris expressed the opinion that Mrs. Baker could not have been able to walk after receiving the blows found on her body, and could not have walked from the place where the profile on the kitchen floor was to where she was lying, on her mother; that she could have had no power of locomotion, in fact could not have moved a hand after she was struck. A piece of a tooth of a comb was found in the hair of Mrs. Baker, and a comb was found in the kitchen, near a pool of blood, close to the profile; and the piece fitted nicely to a remnant of a tooth in the comb. The hair did not seem to have been cut, and a witness expressed the opinion that it was done up when the blows were given. They had washed that day; and the clothes were hung out before dinner, and were still out on the line next day. It was a good drying day, up to 4 o'clock, when it rained. Baker says that his wife told him to get a tub of water from the cistern outside the kitchen door, and she would clean up the kitchen floor; and he did so.

These ladies were good housekeepers, very precise and methodical and regular in work. Some yeast was out on the porch on Monday, and there it still was the day of the discovery of the murder; and little chickens, which they invariably put up, were left at large. The windows of the kitchen were darkened, entirely covered up. The lambrequin of one was pulled down from the top, and pinned across at the top of the lower sash. It was blocked out in the middle, and there a paper was pinned up; and a check-gingham apron

pinned or thrown over the back of a chair and the chair pushed up to the window. The upper part of this window had a dark shawl over the sash, and over this shawl was a white shawl. The white shawl looked like it had been forced right over the heads of the nails. The other kitchen window had a lambrequin at the top, and a green cloth, used for a sewing-machine cover, attached to it, entirely darkening it. There were no tracks, except one, which Baker promptly stated he made on his return from Cross Creek, and which fitted his shoe. The kitchen door was locked, and the key hanging up by it.

The evidence tends to show that the ground around is solid. Investigation was made to determine whether there were any cuts in the night-caps found on the heads corresponding in location with the location of the wounds, but none were found. There was a hole or two worn in them, but not at those points. The wounds on the head could not be seen until those caps were removed. One of the caps was tied very tightly—not merely the knot, but tightly to the neck—so that it would likely have been uncomfortable. A witness stated that there was in the kitchen the appearance of an effort to wipe the blood up with a cloth at the profile, and afterwards the pool stood unwiped near the door. Among the clothing in Mrs. Baker's bed-room, in a press, was a chemise, with a spot of blood on it as large as the end of a finger. In a closet, the door of which was open, on a chair, was one night-cap, and on the floor a bundle of six or eight night-caps. The house on this morning is a scene of confusion. Beds tossed up, their ticks doubled from the foot; drawers of bureaus and trunks rummaged; clothing, letters, and papers scattered on the floor, and bedclothes taken from press and thrown on parlor floor, importing a search for valuables; several pocket-books lying on the floor opened.

Quite early after the arrival of the neighbors, Baker goes to where his trunk is, and points to his pocket-book on the floor, saying that they had taken $350 of his money out of it. He was asked for the key to unlock this trunk; and on inserting it the lock was unlocked but the hasp dropped, it having been broken. He stated that he had before been

there, and unlocked it.   The tray of this trunk was disturbed, but the lower part only slightly disturbed, having some laundried shirts, appearing never to have been used; some unlaundried; some underwear, nicely packed.   Some papers of his were outside of it, on the floor, with the word "Insurance" on them.   Bureaus were greatly rummaged, several drawers out.   But there were two drawers, of different bureaus, that seemed to have been exempted from such invasion.   They contained the clothes of an infant, Baker's only child by this wife, Eliza, which had died the January before she was murdered.   They were nicely stowed away in these drawers.   A silver watch hung up by the window in Mrs. McWha's room.   In a box on the floor in this room was a gold ring, and in another, in a bureau drawer, were one or two more gold rings, some earrings, a gold watch and chain, three pocket-books, open and empty, and a railroad ticket.   In a small drawer on dressing-case were a couple of gold breastpins.   The watch was in a pocket, sewed to the box, so that, to find it, it was necessary to pull the pocket out, and reach back for the watch.   It was a box ten inches square, the lid on the floor.   There were initials, "E. McW.," on the watch. There was also silver-ware found with family letters on it.   In a trunk in the spare room were found the will of Mrs. McWha, and a note for $500.00, with a mortgage, and a gold necklace, with a gold cross attached, and gold breastpin and locket.   The hasp of this trunk had been twisted, as if forced open.   All these things were in a box fifteen inches long, on top of a dress, open to view.

Mrs. McWha owned nine $1,000.00 Allegheny County bonds, worth par, interest payable semi-annually.   Diligent search was made for them; and, almost by accident, they were found—wedged up by means of sticks, somehow—under the marble top of a bureau.   Mrs. McWha owned the property, in which she and her daughter lived, worth $2,500.00 to $3,000.00.   She was a widow, and Mrs. Baker her only living child.   Baker married her in May, 1885.  She was his second wife.   They never had kept house by themselves.   They had one child, born in May, 1886; died in January, 1887.   She continued to live with her mother.   He was a school-teacher, and his wife's letters to

him speak of his lecturing. He is evidently a man of education, strength of mind, and adroitness, judging from his examination as a witness. He was teaching school in Pennsylvania when married. He visited home once, up to July following his marriage. He then canvassed, and was at home, in the mean time, until August 31, 1885, when he left for Minnessota, where he taught school, making a two-weeks visit to his wife, Christmas, 1885, and again in April, 1886, and again in June, 1886, and remained until October; teaching at Eldersville, however, a month. He went back to Minnessota in October, 1886, and returned home April 6, 1887.

Mrs. McWha made a will by which she gave Mrs. Baker her real estate, and household and kitchen furniture: to her grandson, Robert McWha Lee, $1,000.00 in bonds; and to Mrs. Baker, all the rest and residue of her bonds, money, notes, and claims. She made Patterson executor. Robert McWha, father of Mrs. Baker, gave her, by his will, $2,500.00 in bonds. Mrs. Baker made a will shortly before her only child was born. We only know of its contents what Baker stated about it. Mrs. McWha's will, with some of her deeds, was found with said mortgage-bond after the murder. Mrs. Baker's will has never been found. In the kitchen stove were found the remains of burnt paper—apparently a lump burned—also the remains of what several witnesses said looked like a sheet of legal cap paper, folded four-ply. In the examination of the premises it was disturbed so that it could not be subjected to expert scrutiny. The prisoner claims, and there is evidence tending to show, that paper for starting fire was usually kept in a box near the stove, in the kitchen.

Mrs. Dan McCloud states that Baker, after his return from Minnessota, in the spring of 1887, said to her that he had tried to persuade his wife and mother-in-law to go away, as 'there was nothing there for him to do; and that they had made wills and left him nothing—left him out. Mrs. Sturgeon says that Baker told her, speaking of Mrs. McWha's will, that he told Mrs. McWha, "if she didn't do thus and so and so, such persons would come in for a share of her property;" and she said she did not know that until he

told her.. Mrs. Weaver says Baker, speaking of his wife's will, said that Eliza had made her child her sole heir, provided it lived; if not, he was to have $1,000.00; Albert Lee's child, $1,000.00; a namesake, $200.00; and the balance, except what was willed to the church, in various ways; and that he further said they paid ten cents a year, and bought the Lord at last for $500.00; and that he said they were "dern misers;" and that she said to him: "If I were you, I wouldn't worry anything about the will. Women are curious things. They change their minds, sometimes. You treat Eliza right, and perhaps, towards the last, you will get it all"—and· he replied, "Not a bit of danger." At the funeral of Mrs. Georgia Bowles, daughter of Mrs. McWha, in the summer of 1886, he said to Mrs. Weaver that he had said to his wife: "You see Georgia has gone. You are not stout, and, in all probability, you will not be long following her. Why not enjoy yourself? Get the good of what you have"—and remarked to Mrs. Weaver that the old lady wouldn't be here long, and then his good time was coming. According to Mrs. Sturgeon, when returned from the West, he and Mrs. McWha were not on speaking terms, and she would not eat at the table, save a part of one meal, for a number of meals, while she was visiting there. And she represented that on an occasion there Mrs. McWha was worried and both she and her daughter looked frightened, apparently at Baker; and he took up the axe, and, when asked by his wife what he was going to do with it, made no reply, but went on the road towards her home, with her, carrying the axe, and took it to a shop, to grind it.

The front windows of the house had shutters. When the neighbors went to the house, the shutters of Mrs. McWha's room, the sitting-room, were open, the blinds down. The parlor shutters were closed. In one of these parlor shutters was a breach. Three slats in one of them were out; two of them simply out, the other appearing to have been broken in taking it out—split somewhat diagonally. These were five or six slats from bottom. A piece of the side of the frame of the shutter had been jerked out where the slats were mortised in, and the slats not broken slipped out the inside of the frame; a piece jerked out towards the inside—

towards the sash.  There was testimony that there was an indentation on this broken shutter, as if it had been broken from the inside; the mark being where the paint was un-faded.  There was some mud, or muddy water, on the head of a settee inside the parlor, near this window.  There was evidence that there were some marks on the sill of this bro-ken window, as if from tacks in the heel of one going in, or the toe of one coming out.  There was a mark as if some one had set his foot on a bench on the porch at this window. There was a partly burnt candle in Mrs. McWha's room.

Mrs. Brown and Mrs. Swearingen state (the latter a niece of Mrs. McWha) that they went to Mrs. McWha's house to visit, reaching there about 2:40 in the afternoon of Monday, May 9th, and in the adjoining commons looked closely all around, especially over the McWha premises—orchard and all—to see some man to remove a brush tightly fastened in the buggy wheel, but saw no one anywhere.  Then they went to the front porch.  Rang the bell—heard its sound—but no one answered; and after some time rang it again, more vigor-ously, and, still receiving no answer, Mrs. Swearingen went around the house, passing the kitchen windows; and she states that they were blinded closely ; that she tried to look into them, but could not; that the window of Mrs. Baker's room and the back hall window were also closely blinded. She says she had a full view of the orchard and entire premi-ses, and saw or heard no one anywhere.  She went to the kitchen door, and she says:  "When I went to the kitchen door, I put my foot on the step, and took hold of the knob of the kitchen door, and turned it, saying: 'Eliza, it is me. Let me in.'  And as I said this I pushed the door, and it went open about six or eight inches, and then it was shoved back instantly ; and I felt the pressure of the shove back." She saw no one, heard no noise.  She then returned to the front of the house, where she had left Mrs. Brown.  They remained awhile, plucked some flowers, and left.  Mrs. Brown says that Mrs. Swearingen, when she received no answer to the ringing, went around the house to find some one, leaving her baby with her, and that when she returned she said the kitchen door had been slammed in her face. These witnesses reached Mrs. Brown's house on their re-

turn at 3:10. Mrs. Brown says that she noticed that the blinds of Mrs. McWha's room were down, the shutters open, and the parlor shutters shut. She sat on bench at parlor shutter. Mrs. Campbell says she saw these ladies drive up to Mrs. McWha's, and go away, and had full view of the entire McWha premises—orchard, yard, and all just before her, as well as the commons—and did not see Ralston or any men, or Mrs. Baker or Mrs. McWha, anywhere, at that time or that afternoon.

Now, as to Baker's whereabouts. He states on the witness stand that on this Monday forenoon he was working about the premises, preparing ground for cucumbers, and cut with the axe some apple limbs to put over them. Stuck the axe in the tree, and is not certain whether he left it there. That is the last of his recollection of it. Then went out on the common. Met three men, White, Davidson, and Nelson, who wished to rent the stable, and showed them the stable; and they then went to see if they could get work on the new railroad then being made there. He says they were not in the orchard any distance at all. Was in the village till people were going to dinner. Then went home, and found, at the back hall door, said three men, talking with Mrs. McWha and his wife: and they rented the stable of them; and he altered an article of lease which had been prepared some time before for one Mudd, who rented the stable, but did not take it; and it was signed, and is produced in evidence; and White corroborates Baker in these statements except that he says the three men and Baker went into the orchard to look at pasture they wanted in connection with the stable. This return, when they rented, was about 12 o'clock; and they left after renting, between 12 and 1. Mrs. Baker was cooking dinner while they were there. Mrs. McWha was there, and signed the lease. Baker says they ate dinner, and his wife cleaned up the dishes; that either just before or after dinner he emptied one or two of the wash-tubs, and brought fresh water in the other, from the cistern, to mop up the floor. He was going to Steubenville that day, to see a son there about sending him some furniture. Starting about 2 o'clock, there was a train he could get to the Wheeling junction, and catch a return to Hamlin's station. He states

that about 2 o'clock three men came to the back hall door, and said they wanted to rent the stable, and were informed that it had been rented; and they said they were not particular about the stable, if they could rent "that lot out there;" that they wanted to put up a shanty to board railroad laborers. His wife came out, (she was then dressing) and said : "I know from experience he is a nice man. If you want that lot, you will have to pay a good price"—and they replied that they expected to do so. They then started, he says, to see the lot— the men, his wife, himself, and Mrs. McWha; and when they reached the stable, Mrs. McWha told her daughter to do as she pleased with the lot, and returned to the house; and they went on to the orchard—did not go further, but had their faces to the young orchard. In fact, it is one orchard; but a fence circles off near the old orchard. They went to the three-cornered lot. He said : "Let's hurry, I want to go to town, and do not think I can make it now." His wife said : "Never mind. You can attend to that again. We want to get this attended to now." His wife said they would go to the house, to see if her mother was satisfied; and that she went in, and talked to her in the bed-room about the rent agreed on, he remaining out at the door, with the men. He says he heard Mrs. McWha say to his wife : "Just a bit ago there was somebody here wanted to come in, and I wouldn't let them in. I suppose they were here to rent the house." That his wife said, " Who was it, mother ?" and she replied : "I don't know. Some more of the Paddies, I expect." That his wife then said : "Mother, it might have been some of the neighbors making a call." That the mother replied, "I don't think it was; and, even if it was, I wasn't fixed for callers," and the daughter replied, "Mother, I'm so sorry." He says she came out into the hall, and one of the men took out a roll of money, and handed a $50 bill to pay $10 for one month's rent, and asked Baker to change it, which he was about to do, when his wife said, " Wait, mother can change it," and went into the room, and returned with the change. Baker says they then left, and he remarked he would have to start, or he would miss the four o'clock train ; and that he could not go to Steubenville now, and didn't believe he could get the other train. That his wife brought him a satchel

into the parlor. He states that the shutter of the parlor was then closed : the window up. He said "Good-bye" to Mrs. McWha, and she replied the same to him. That his wife kissed him good-bye, and asked when he would return, and he said, "May be to-morrow, according to how his father was." He went by an unusual route—but, as he claims, by some near cuts—to the depot; and so, if he missed a train going to his father's, he would be nearer the junction, so he could go there and get a train to Steubenville the other way, passing a state witness, Knox, who saw him come down from the common adjoining the McWha premises, with satchel in hand, and pass within thirty feet of him. Knox says the only striking thing about him was that he seemed to be in a hurry, and did not speak to him; a thing unusual, as they were intimate. Knox said he looked like he had been at work; and, being asked what he meant by that, he said, "A man is generally flushed on a hot day, when he is working;" and, being asked if Baker's countenance was flushed, he answered, "It was." Knox states that he saw Mrs. Brown and Mrs. Swearingen before he saw Baker. Baker, before reaching the station, went to a spring ; he says, to get a drink. He says he saw a buggy in Brown's yard, without a horse in it, as he went to the station. He did not go by it, but some 400 or 500 yards from it, though that would have been on the shorter route to the station. The state claims he avoided it on purpose. He denies having seen the buggy or ladies at Mrs. McWha's. At the station he met Gilmore and Roberts. Baker and they say that mention was made of its being a hot day, especially when one is in a hurry to make a train. Gilmore states that Baker said the women had kept him to rent "some property or land," he did not remember which ; and it had kept him late, and caused him to be in a hurry. Recalled, and asked how many men Baker mentioned in that conversation about renting. He replied : "Mr. Baker said he had property and a stable, or land and a stable—something like that—rented to three men ; and those three men came, and three other men came that day, wanting to rent the stable and lot or property—a place to turn the horses in, I suppose—saying that the three other men did not want it, and they could take it ; and he had to stay there, and see the

business done for the women." Roberts said that Baker said he had been detained by three men there to rent the stable and lot; that Baker said he had transferred the old article to these men—Paddy Flinn's old article—and that had detained him. Paddly Flinn was the same man as Mudd. A lease had been prepared between Mrs. McWha and him for the stable, and also the old orchard as a pasture for horses. Flinn did not take the property; and this article was altered as to the name, and used in the lease of same property to White, Wilson, and Davidson, who left the house between 12 and 1 o'clock. It is another lot, called the "Three Cornered Lot" which Baker says the three men who came to the house after White, Nelson, and Davidson had departed wished to lease. Baker contradicts Roberts in saying he had transferred this old article to those three men. Baker goes by train twelve or fifteen miles to Hamlin's station; thence walks to his father's, about four miles from Hamlin's. At Hamlin's, he meets Butterfoss; and he, stating what Baker told him he had been doing that day, says: "He told me he had been very busy, and had been running around, and got up in the morning, went over to Steubenville, and made several calls in Steubenville, and gone to the station, and got on a train. Came out to Wheeling junction, and walked from that home; and there was a pack of Italians there, and some persons wanting to rent a stable, and he was bothered a great deal with them." Certainly Baker was not in Steubenville that day. Baker denies this language, but says he did see Butterfoss as he went, at Hamlin's. Butterfoss says he met Baker next morning at 6 o'clock, and told Baker he thought he had gone to Pittsburg; and Baker said: "He had changed his mind; that he had forgotten something at the Cove, and he had come down to take the train at Hamlin's and go home, and take the 3 o'clock train for Pittsburg.". Baker denies seeing Butterfoss this morning. He denies this conversation *in toto.* Other persons met Baker at Hamlin's.

At Cross Creek, Baker stays all night at his father's, and sleeps with his son, and arranges for some furniture to be sent to his son, as he and his son state. When he returns to Holiday's Cove he goes to the McWha house, seen on his way by several persons. Here it is noted that there is consider-

able evidence tending to show that, from the time he passed certain persons or places, and the distance to the house, until the alarm of the murder, he must have been there some time before he gave the alarm, the state claiming that then it was he himself broke the parlor shutter from within; and there is evidence tending to show that he was likely not there long before giving the alarm. Mrs. Swearingen saw him pass before her horse was hitched to the buggy to go home. She says it was a good many minutes before she started, and, as she was driving home, found him at the front gate of the McWha yard. Spoke to him, saying to him to tell Eliza she had been there the day before to see her, and Baker answered that he supposed they were in the orchard at the time. He then asked who he should tell was there, and she replied. "Mrs. Swearingen," and he said, "Dan's wife?" and she said, "Yes." He did not ask her to go to the house. She says she had not seen Mrs. Baker (her cousin) and Mrs. McWha for some time, and had been requested by them to visit them.

Baker is seen standing near the house, crying, "Murder! For God's sake, come quickly!" He seems greatly excited, distressed, and lamenting, when neighbors come. A witness says he was crying, but he saw no tears. A witness, Hall, represents him as making "considerable noise about his wife, trying to cry, or crying, or something of that kind," but saw no tears. Randolph Gilmore, on this alarm, ran at once 100 yards to the house; went in, and looked at the corpses; came out; and Baker caught him by the arm, and, pointing to the broken parlor shutter, said, "Look there." On this Tuesday, Baker had a conversation with Justice Lee, who held the inquest. Lee says he took dinner with him, and Baker "particularly stated about the time he went away, and about his going, who he saw at Holliday's Cove station, who he saw at Hamlin's when he got off; about his folks at Cross Creek; and spoke that he had thought he wouldn't come home until Tuesday evening when he went up, but on reflection he thought there was so many people around there; and he got some articles he desired, and went back to his father's, and told his mother he wanted to go on the morning train." He (Baker) spoke to

Lee of three men being there, renting the stable; and after they left there were three men who wanted to rent' the three-cornered lot; that they wanted to look at it; and he and his wife, and her mother started, and Mrs. McWha said she was tired, and returned; and they went to see it, and made the bargain; and one of them paid $10.00 advance rent out of a $50.00 bill, which he was about to change, when his wife said her mother could change it, and she went in and got the change from her mother. To Constable Campbell, on Wednesday, he said: "In all probability, those three men that came to my house, or my mother-in-law's house, might have loitered around until they saw me go away on the railroad, and come back and murdered my wife and mother-in-law in my absence; and they might have been murdered before night." And, in that connection, that Baker said: "Mrs. Brown and Mrs. Swearingen must have left the house a few minutes before I did. As I went across the bottom I saw Mrs Brown and Mrs. Swearingen drive in at Brown's gate."

Daniel McCloud says that in jail Baker asked if there were any new developments about the murder, and said tramps had committed the murder, and that some time in the forenoon of Tuesday three men were at a brickyard some miles off, telling of the murder, and said they might be suspected. Afterwards, in about fifteen minutes, he said: "I will tell you who done that thing. It was Abe Lee. Abe Lee was there, I think, on Friday before the murder, and had a long, private conversation with the old lady." He said Lee knew more about the house than he did; that, when the bonds were looked for, Lee could tell where they could be found by looking under a certain bureau drawer in a little wooden box; and when they came to look for the box, and pulled it out and brushed the dust off, the bonds were there. He said he did not know there was such a box in the house. McCloud also stated that he said to Baker, "Baker what are you going to do with that little bit of evidence about Eliza's shoes having blood on them? If she had taken them shoes off before she went to bed, and set them under the bed before, that blood would not have been

found on them," and that Baker replied: "Oh, since we have looked around, and seen how everything was, we have given up the night theory—that they were murdered at night. Why, wasn't there lots of time from 3 o'clock until dark for them to be murdered?" McCloud said, on the day of the discovery of the bodies, Baker said he had read an account in the paper of the murder, accusing him of the murder, and he was ready to be arrested, and could prove himself clear. McCloud asked him how the thing happened; and Baker said: "Sit down, and I'll tell you all about it." He then spoke of the three men who came there to rent the stable, and of the three who came to rent the lot, and the changing of the $50.00 bill by Mrs. McWha, and said: "Now, they knew there was $90.00 money in the house, and that I had proffered to change the bill, and had $40.00, and had given my wife the $50.00 bill." He said he believed those men had murdered the women. He talked about their stealing $350.00 of him; about the gold watch of his wife and the silver watch being left. McCloud states further: "I think he said, when the shove came to the kitchen door him and his wife was in the front room. After that he said Mrs. McWha had come into the room, and told him and his wife that some person had shoved the door open, and she had shoved it to; and they had scolded her, and told her she ought not to have done it—that it might have been some of the neighbors; and she said: 'No, it was none of the neighbors. It was some of the Paddies off the railroad.'" He then told about meeting Mrs. Swearingen at the front gate and of Mrs. S. telling him to tell Eliza she had called to see her the day before; and of his then going to the house and entering the front door, and seeing the horrible sight of the dead bodies. McCloud asked him how that tub came in the kitchen; and he said he had put it there the day before, as his wife had intended to mop the floor, but, as it was a wet day, put it off till Tuesday.

Robert Patterson states that on this Tuesday, Baker, near the McWha house, put his hand on his shoulder, or his arm around his neck, and told him about finding the bodies when he came to the house that morning, and said that "Eliza was lying on her mother, and her hand was clasped in her

mother's, as though she had come and died on her mother's breast." White and other renters of the stable were to put their horses in it that night, and so told Baker when they rented it, if they could get ready; and they did put them there at 8 or 9 o'clock that night. It was close to the house, and they saw no light, and heard no noise in the house. White states that as they were leaving the house Monday, after renting, the two women remained at the house, and Baker followed them nearly to the front gate, and told them, if they came that evening, they need not go to the house or anything, but just go on to the stable, and not bother the house. Nelson states the same. Baker's version of this is that they said it would be late when they would come, may be not that night, and he said: "When you come, if you don't find the front door open, pass around to the back of the stable, and open that door—it is always open; and you can then open the door next to the common, and enter there;" and that the women could hear that, and they stopped nearer the gate, and he stepped to them, and said: "When you occupy the stable, if the women come out and say anything, don't get into any argument with them." He does not remember anything about telling them not to come to the house. Baker says that when the three men rented the lot his wife said to them that he would have an article of lease prepared. In answer to questions, he states that no receipt was given for the $10.00 they paid in advance, nor any memorandum of their right; nor did he, or any one, obtain their names, nor did they tell their names, nor say where they were from, nor their former residence. He said they looked to be respectable, well-dressed men —one with a cut-away. He denied even calling them, in conversation, "tramps." These men never came back.

W. S. Miller states that on Tuesday after Baker had given his evidence before the coroner he saw Baker in the orchard close to Lee's fence, walking slowly towards it. Under this fence some of Baker's stock certificates were afterwards found. William Caldwell says on 15th or 16th April, 1887, he met Baker, and Baker, speaking of a certain woman, said he thought as much of her as any woman living; and Caldwell said to him he supposed he

thought as much of his own wife; and Baker said he did not, and added: "Bill, them people down there are nothing but damn misers." He said they had plenty to live on, but were too stingy to take it; and that he had never been used to that kind of a living since he had been a man, making money. A. G. Lee said Baker, twice on Tuesday and once on Wednesday, told him he wanted to have a private talk with him, and the first two times he replied that he would see him another time; and on Wednesday Baker told him he thought they ought to look after those bonds—they appeared to be gone—and said they ought to have detectives to look after them.

Mrs. Wilcoxen went early to see the bodies, and in going away met and spoke to John J. Henderson. Henderson says Baker was looking at them, and when he came up asked Henderson what that woman was saying to him, and he replied nothing in reference to him. Robert Miskelly states that Baker, while in jail, said he got the water in the tub for the women, and that Baker said: "Even if I did kill the women, what would I have needed with two weapons, when either of the weapons would have done?" Witness said he referred to axe and pin; that he was talking about the way the thing happened. On cross-examination he makes Baker's expression: "Even if I had killed them, what use would I have had with two weapons, the pin and the axe?" Miskelly states that Baker said he was in the room, getting ready to leave, at the time some people called. He and his wife were in there, he said, and Mrs. McWha came in the room, and said there was some men at the door; and Mrs. Baker said it might have been neighbors; and Mrs. Mc-Wha said: "Well, she didn't care—she did not feel like receiving callers to-day; and that she just closed the door." On cross-examination he was asked if Baker said he was in the room when the people called, and answered: "No, he didn't say that." John Crosinger says he heard this conversation with Miskelly—probably the same; that he could not give the full conversation, but said: "The part which I remember particularly was, he said: 'Now, when these women called, my wife and I were out in the orchard. I made some remark about going in the house.' He stated

the remark, but I have forgotten it. He says, 'My wife made the remark that she would rather stay out there with me,'—words to that effect. After we went into the house we went into the sitting-room. Mrs. McWha came in, and she says: 'Them railroad men were back again.' His wife said: 'No, mother; it wasn't railroad men. It was Mrs. Brown and Mrs. Swearingen.' That is all I recollect distinctly."

Samuel Murray states that he was in the jail corridor, and Baker was talking to some ladies from abroad about the murder. And Baker said: "We were in the house when the ladies were there." Murray was there only a minute. He said he understood they were talking about the murder. Baker says, as to this, that these ladies said it was strange that Mrs. McWha did not hear the bell when Mrs. Swearingen and Mrs. Brown rang it, and that he replied that some other ladies had called and rang it on another occasion, and she did not hear it, and he said: "We were in the room when they rang the bell"— thus referring to other ladies, not Mrs. Brown and Mrs. Swearingen.

Baker's pantaloons were sent to Pittsburg, July 8, 1887, to Prof. Logan, a microscopist, for test as to blood spots. He did not find blood spots, only indications of their presence. He said: "There were strong indications of the presence of blood, but not conclusive enough to justify me in swearing there was blood. I examined the scrapings from suspected spots under the action of chemicals. I wanted to get undoubted blood corpuscles detached, to obtain the hemin crystals of Teichmann." "The spots, when treated by chemicals, under the microscope, give precisely the same appearance and changes as were obtained by treating known blood stains in the same way. These are indications, not actual proof. My best judgment is that there was blood on the pants, but would not swear there was, without the additional confirmatory proof I was searching for." The pantaloons were then put into the hands of Dr. McKennon, of Pittsburg, a microscopist. He made tests with the microscope, in connection with Prof. McCann, of nine spots, and found red blood corpuscles in seven of them. These spots were on the front of the legs; varied in size. Seemed to be spread out over con-

siderable portion of the cloth.   He also subjected them to
chemical tests, and stated that there was evidence of the ex-
istence of blood confirmatory of his other tests.   He cut out
pieces containing spots.   Dr. Reeves was introduced by
defendant and stated that he examined the pantaloons later,
and made a test for blood crystals, and is quite decided in
saying he found no trace of blood on the pantaloons, but
found unmistakable evidence of blood on Mrs. Baker's shoes.
E. G. Richardson states that on the afternoon of the day of
the discovery of the murder he saw on the inside of Baker's
pantaloons leg a spot several inches long, and on the hip
pocket three finger-marks.   They looked like blood.   He
saw them in the house and out of doors.   William Barnes
states that at Hamlin's station, on the morning Baker was at
Hamlin's, he saw Baker walk a few steps from those he was
talking with, and rub his pants on the leg;  did so the second
time;  and the third time went a little further off, and spit on
his hands, and rubbed them near the knee.   This was in view
of a gang of hands.   Baker had been walking in rain, he
says, and was brushing off only mud.   There was evidence,
by witnesses introduced by him, to show that he had a habit
of brushing his clothes—so much so that people laughed and
joked about it.   Oliver Lee stated that he saw Baker the
Friday after the murder, in jail, and he was nude, except as
to a shirt;  that he could only see his head and half way down
his body;  and Baker had a pair of pantaloons, rubbing them
—probably cleaning them—on the left leg, below the fly;
that Baker looked up, and, as Lee thinks, caught his eye, and
threw the pantaloons down, and began reading a newspaper.
There was evidence on behalf of Baker that the window was
obscured by a newspaper so no one could see in, and evi-
dence to rebut that.   Baker contradicted Lee's evidence.
There was evidence adduced by Baker that a horse was bled on
the Sunday before, where Baker was present, leaving room
for inference that thus blood might have gotten on panta-
loons;  but there was no evidence that it did;  and he did
not in his evidence state that it did;  there was evidence
that he assisted only in drenching the sick horse;  and a
witness stated positively that the horse did not bleed at all.
Sheriff Lindsay and another witness saw spots on the panta-

loons, but regarded them, not blood stains, but rust from the iron floor of the cage.

Baker introduced Samuel Ralston. He stated that about 2 o'clock, Monday, he saw Baker and a woman—he did not notice to say who she was—and men walking through the orchard, towards the three-cornered lot. He is indefinite about the number. He further states that he saw Mrs. Baker, about 5 o'clock Monday evening, going towards the stable, bare-headed, about an hour after Baker has passed him, going to the train. Gardner states that he saw Baker, his wife, and one or two men, just after he got his dinner, about 1 o'clock, going through the orchard towards that lot, and then went to his stable, stayed about ten minutes, and went to the common, and then met Ralston, and sat down and talked a half hour with him, when they separated, and Ralston went to his shanty. A considerable quantity of evidence was adduced by the state to impeach Ralston, by showing contradictory statements made by him touching his seeing Baker and his wife and men in the orchard, and his seeing Mrs. Baker after Baker's departure, and his saying she had a bonnet on, but on the stand said she was bare-headed.

A little boy, eight years old, introduced by Baker, stated that Monday evening, about five o'clock, he saw Mrs. Baker come out to the pump and get a drink. He made on a former trial a statement variant from this as to time, then putting it right after dinner. His examination on this trial is not satisfactory. There was evidence tending to show that his mother told him, on the way to the first trial, that he must swear that he saw Mrs. Baker, and that she would get him the nicest suit of clothes to be found in town, though he said that he had not seen her. And there is evidence tending to show that on another occasion, when he said he did not see Mrs. Baker, she said, in effect, "You know you did see her." And there is evidence tending to show that when the child went home on that Monday evening he told his mother, just as soon as he got home, that he had seen Mrs. Baker, at the pump draw a cup of water, drink some, and throw the balance down.

Oliver Grimes states that from the railroad dump, Monday evening, after he had seen Baker going to the train, he saw

Mrs. Baker going up the path, through the yard, from the gate to the house.   The state introduced numerous witnesses impeaching Grimes, by proof of bad general reputation for veracity; and the defense, a small number to sustain it. Much detail of evidence was given tending to affect the evidence of these witnesses; but it is unnecessary to give such details here, under the general rule governing motions for new trials, and the rule in *Flanagan's Case* above stated.

### OPINION ON THE EVIDENCE.

*Is Van B. Baker guilty of this horrible double murder?*

> "Murder most foul, as in the best it is ;
> But this most foul, strange and unnatural,"

—if committed by the defendant.   This court is not compelled to answer this question pointedly, or to say what its members would have done, had they been of the jury.   Two juries have answered this question against him—one of Hancock county, deciding that his death should be the penalty; one of Brooke county, directing that he be confined in the penitentiary for life.   It is only with the latter's verdict we have to deal.   It has been approved by an able, conscientious circuit judge.   All we have to do is to say whether this verdict is manifestly and plainly contrary to or without sufficient evidence.   If it is not, we can not touch it.   Further, even, than that, under *Flanagan's Case*, above cited, we must reject all evidence in behalf of the prisoner that conflicts with that of the State, and give full faith and credit to that of the State, allowing it to prove all that may fairly be deduced from it; and, unless, after so doing, we regard the verdict as still wrong, we can not touch it.   We can not say that it is wrong. We can not say, under the mass of · facts and circumstances which were before the jury in this case, that this verdict is plainly without evidence sufficient.   There are many forcible circumstances looking strongly against the prisoner.

There is always a motive for a crime.   "When so heinous and startling a crime is committed, the very first inquiry is always, who was the enemy of the murdered man?  Who had the motive?"   *Dean's Case*, 32 Gratt. 918.   In Burrill's Circumstantial Evidence, (page 285) it is said :   "The motive to the commission of crime may be reduced to two principal

heads—the desire of an unlawful gain; and the gratification of unlawful passion." And on page 287 : "Another form, in which murder is committed for the sake of immediate gain, is where the property of a person has been, by force of circumstances, brought under the control, or within the reach, of another, and nothing but the life of such person prevents its passing entirely into the others hands." See, also, Lawson, Pres. Ev. 495, 496 ; *Hendrickson* v. *People*, 1 Park. Crim. R. 415, 422. In criminal annals there are many instances of murder where the person murdered stood between the murderers and their possession of property.

Mrs. McWha had willed all her real estate, and all her personal estate, except $1,000.00 and a silver watch given to a grandson, Robert McWha Lee, to Mrs. Baker. If Mrs. McWha should die first, this estate would vest in Mrs. Baker; and then, if she should die without a will, Baker would have a life-estate by the curtesy in this real estate, and an absolute estate in the personal property. Mrs. Baker had made a will giving him only $1,000.00. If Mrs. McWha's will exists, upon her death Mrs. Baker gets her estate, provided Mrs. McWha dies first; but, if Mrs. Baker's will exists, it gives her husband only a small part of her estate, and he could not get that until her death. In the house, after the murder, Mrs. McWha's will is found intact, but no will of Mrs. Baker. The remains of a burnt paper, retaining the shape and appearance of a sheet of legal cap paper, folded fourply, are found in the kitchen, in the cooking stove, on the top of the ashes. Baker says they kept a box of paper by the stove, to start fire. But why would the remains of this paper be found on top of the ashes when the fire was out? As long as Mrs. McWha lives, she holds the property. She is found murdered, but her will safe. As long as Mrs. Baker should live after her mother's death, she would hold this very considerable estate. She, too, is found murdered; but her will is not found. If she made a will—and he says she did make one, which gave him only $1,000.00—it would be to Baker's interest to destroy it, for thus he would get all her personalty absolutely, and her realty for life. If she had made no will, to give him all her estate at once, her death is necessary.

Here is a motive for the death of Mrs. McWha. Here is motive for the death of Mrs. Baker. That motive points to the prisoner as the guilty agent. But, if Mrs. McWha lived longer than Mrs. Baker, the legacy and devise to Mrs. Baker would lapse, and Baker get nothing, because the property had never vested in his wife, from whom he would take, and it would go to the mother's kindred. Therefore the necessity that it should appear that the mother died first. Hence we.find in the scene of this tragedy the mother lying on her back, dead, and on top of her, upon her breast, the dead daughter. That fact, in a contest as to which died first, he may have thought would be a strong, perhaps a controlling, circumstance, to show that the mother's spirit departed first, and left the daughter to survive her, though it were but a moment, and thus invest the estate in the daughter, and on her death vest it in her husband. The jury may have thought it was this purpose which added additional horror to the scene of the tragedy, in the picture of the daughter, bloody, her hair disheveled and clotted with her own blood, lying across her mother, breast to breast, in the embrace of death. The daughter's body was brought from the kitchen dripping with blood, leaving a trail of blood spots on the floor of Mrs. McWha's room, smearing blood on the jamb of the door between that room and the kitchen, and dropping on the step of that door, as the body was carried along, in order to place it on Mrs. McWha's body, to show. that she died first. Mrs. Baker was murdered in the kitchen. A tooth of a comb found in her hair fitted precisely in a comb found in the kitchen near the blood profile of her body on the kitchen floor. Other circumstances show it. It is safe to say, from those dreadful wounds, from the form of her body shaped in blood on the kitchen floor, outlined by the blood that flowed around it, and from Dr. Morris' evidence, that she could not have moved; that she fell and died at once in the kitchen, notwithstanding that the prisoner said that when he first saw her her hand was clasped in her mother's, as though she had come and died on her mother's breast. Did he have a motive, also, to suggest this theory? Would the nameless strangers whom the prisoner suggests as the murderers have any motive or

purpose in carrying the daughter from the kitchen, and laying her upon the mother? It seems not. But the prisoner had. And if, as the prisoner also suggested as a probability, the father of the grandchild of Mrs. McWha, Lee, did the act, he ought to have destroyed Mrs. McWha's will, which gave Mrs. Baker the estate, and have placed Mrs. McWha's body on top of Mrs. Baker's, a fact tending to show that Mrs. Baker died first, and thus his child would have inherited the more. In addition, without regard to wills or heirship, if, by killing them, the prisoner could get hold of the $9,000.00 Allegheny county bonds, which were payable to bearer and unlike the mortgage note, and could be sold—even by one who had obtained them by crime—in the market, by mere sale and delivery, and worth par, he would get a large sum. He is several times heard to speak anxiously about these bonds, after search did not reveal them. He wanted to employ a detective to trace them. He said he did not know where they were kept. They had been hidden by Mrs. McWha. Had he searched for them, and not found them? or was the interruption caused by the visiting ladies the reason for giving up the search and taking a hasty departure? They would go back to the village, and tell all about the strange appearance of the house. The bonds were afterwards found in a secret place, after many searches had been made for them, where any one, likely, would, in a hasty or incomplete search, have missed them. He talks about the will, and his wife, and her mother. On the third day after his return from the west he talked about his wife's will to Mrs. Sturgeon, saying she had left $500.00 to the church, and he had told her that, if she wanted to buy the Lord, to take some young man, and educate him for the ministry. He said to Mrs. Weaver that in the course of nature the old lady would not live long, and then his good time would come.

And that tub of water in the mother's room, just between the feet of mother and daughter, and in it the home axe, iron pin, and car-coupling; the bloody dresses they wore; the piece of muslin, and two night-caps tied together; and a pair of stockings, looking as if blood had been mopped up with the muslin and caps! Did strangers put the tub there? What were these articles put in the tub for? To wash

them.  Would strangers have stopped to wash them?  It is
somewhat remarkable that Baker would do this, but more
so that strangers would.  Likely, the design was to create
the impression of night murder, while he was absent, after
the mother and daughter had retired; and, to further this,
wash the blood from the dresses, mop up the blood from the
kitchen with this piece of muslin and the night-caps tied
together, cleansing them for further mopping; and wash
the home ax, as well as the pin and coupling, (we do not
know whether they belong there or not;) and put their
night-clothes on.  And interruption coming, and with it
fear of discovery, the work was left unaccomplished.  Some
mopping had been done on the kitchen floor; on the kitchen
table; on the step between the kitchen and Mrs. McWha's
room.  Strangers would not have done this deed in day-time,
though Baker told a witness they might have done so.  If
they had, they would have had no special motive to produce
the idea of night murder; but the prisoner had such motive,
for he was away that night.

    This theory of night murder was plainly in the criminal's
mind.  The bodies were partly undressed; feet bare; dresses
off; skirt and waist of both still on, (these, on a hot night,
would likely have been off,) night-caps on—put on in the
process of dressing—put on wrong, in the haste and excite-
ment, and in a room so darkened that it was difficult to see.
A night-gown in the press, not worn, with a blood spot on
it.  Mrs. McWha's stockings and shoes under her bed, as
she usually put them.  Mrs. Baker's shoes without stock-
ings, (likely, they were bloody,) were under her bed in
another room, to create the impression she had retired.
There was blood on them, which an effort had been made to
wipe off, but streaks were left.  Strange that a stranger
would wipe them off.  It was from a seam in them that Dr.
Reeves obtained blood, as he states positively.  In the hurry
and darkness the washing was imperfect.  The object was
to produce the impression that she had gone to bed, was
attacked there, and ran to her mother's room, and was then
killed, or, hearing the noise of her mother's murder, had run
to her room, and there met her fate at the murderer's hands.
Would these strangers to whom Baker attributes the deed,

have carried her shoes to her room? It is sure they had not retired before their death, for they are not in night-dress. They would not have put on caps inside out, and wrong side foremost. If the caps were on before, how does it happen that the hair of both was hanging out at length? One was tied entirely too tightly for comfort, the other had one string. There were no cuts in them corresponding with the location of any of the many wounds. The bloody bonnet was hanging on the wall in the kitchen. Some of Mrs Baker's hair was clotted to her dress, and one sleeve of each dress was inside out, and one of the stockings turned wrong side out, tending to show that the garments had been pulled off hastily. The prisoner states that there were a short night-gown and night cap in Mrs. Baker's room. There was a gown in Mrs. McWha's bed rolled up. The beds of both would have appeared unbroken, if the deed had been done in the day time. Hence they are torn up, the ticks folded from foot to head.

The prisoner himself, when a witness asked him what he would do with the fact that Mrs. Baker's shoes were under the bed, and if she had gone to bed after putting them there, and then been murdered, they would not have been found bloody, replied that since they had looked around they had given up the theory that the murder was after they had retired. They must have been killed in the afternoon, not at night. Dr. Morris gives it as his opinion, from appearance of the bodies and blood, that they had been dead at least twenty four hours prior to 3 o'clock Tuesday. When neighbors first went to the house the bodies were cold to the touch, and the blood on the carpet seemed dry around the bodies. The clothes washed that day, and hung out in the forenoon—though it was a good day for drying, and rain came at 4 o'clock—and yeast put the day before on the front porch, were still out Tuesday morning; unusual at this house, where exact system was the rule of housekeeping. Chickens invariably cooped were out next morning. The cistern lid was off; a very unusual thing. The usual coal and kindling for making the fire in the morning were not there. The burden of argument for the prisoner, that there was not time after the dinner dishes were washed, as they were in order the next

morning, till Baker left, to commit the murder, and do what the appearances indicated had been done in the house, is without force. How do we certainly know that they ate dinner? The men renting the stable left at 1, and Baker at nearly 4 o'clock. It would require no great while. Estimates of time and fixing points of time are uncertain. Baker was there until he left for the train, nearly 4 o'clock. Mrs. Brown and Mrs. Swearingen go to Mrs. McWha's to call, reaching there 2:30 to 2:40 P. M. They ring the door-bell. There is no answer. Waiting awhile, they ring more vigorously. Still no answer comes. The blinds of Mrs. McWha's room are drawn clear down. Mrs. Brown remains on the front porch. Mrs. Swearingen goes around to the rear of the house, in quest of some one. She passes the window of Mrs. Baker's room, and its blinds are down, and a back hall window, likewise. She passes the two kitchen windows, and finds them closely blinded, so that, though she tried, she could not see in. She goes to the kitchen door, turns its knob, and pushes it open six or eight inches, and she says: "Eliza, it's me. L t me in"—and the door is instantly shoved shut, and she felt the pressure of the shove. She tells Mrs. Brown, when she returns to the front of the house, that the door was slammed in her face, and that she was hurt at it. She returned to the front of the house; and the windows are the same way. They remain some time, then return to Mrs. Brown's reaching there at 3:10. Mrs. S. says once it was about 4. They saw no one, heard no one—no sound within the house.

It is full of wonder that all these windows are hooded at this hour, when the sun is almost at meridian brightness. Mrs. Campbell lived close; had known the mother and daughter eighteen years, and never saw their windows thus blinded. No other instance is shown. Did Mrs. Baker or her mother tear down a lambrequin, and use a white shawl of a dead sister and daughter to blind the kitchen window? Who believes that they did? The windows are still darkened next morning. What is the explanation? None adequate. Baker says that, as he left the day before, he passed out of the kitchen door, but does not remember ever seeing the windows darkened. He says that he saw or heard nothing of these ladies. That at that time he and his wife were out in

the orchard with three men, renting them a lot; and that Mrs. McWha was in the house; and that when they returned his wife went in the room, to inform her of the terms of lease, while he and the men stood at the back hall door, and he heard Mrs. McWha say to his wife: "Just a bit ago there was somebody here wanted in, and I wouldn't let them in. I suppose they were here to rent the house." That his wife said: "Mother, who was it?" and she answered; "I don't know who it was. Some more of the Paddies, I expect." That then his wife said: "Mother, it might have been some of the neighbors making you a call;" and the mother then said: "I don't think it was, and, even if it was, I wasn't fixed for callers." Just when he first told this does not appear. He told it to Squire Lee Tuesday, at dinner. Had he heard from others, so soon, that Mrs. Brown and Mrs. Swearingen had called? or did it spring from a real fact? or did it spring from the fact that he was in the house when those ladies were there, and this statement was raised to meet the potent occurrence of these ladies having been there? Probably the jury held the last view. Just here it is proper to say that these ladies, when they came, hitched their horse, and looked closely around over the premises to see a man to remove a brush fastened tightly to the wheel of the buggy, which was dangerous, as it frightened their horse, and say they had a full view of the premises, and saw no one whatever; and Mrs. Swearingen says that when she went to the rear of the house she had a full view of the rear of the premises, and saw no one. It was very natural that she would look very carefully, as she was hunting the family. Mrs. Campbell says she saw these ladies go to and return from the house, from her garden, and had full view of McWha's premises right before her, from her garden, and is decided in saying she saw no one." The three strangers and Baker and his wife are not seen.

Here it may be again asked, if Mrs. McWha was alone in the house, why did she have all these windows shrouded? Why would she not open to the familiar voice of her niece? Baker does not always tell it the same way exactly. As a witness, he says he was standing just in the hall with these men, at the door, when his wife was in the room with her

mother, engaged in this conversation about the lot, and that he did not see his wife, but heard this talk between her and her mother, about some one wanting in ; whereas, at other times he tells it that he and his wife were in the room when Mrs. McWha told about some one wanting in. He stated to McCloud that he and his wife were in the front room when the shove was made at the front door, and afterwards said that Mrs. McWha came in, and told them some one had shoved the door open, and she had shoved it too. He also stated to Swearingen that he and his wife were in the room when the door was pushed open, or at the time of "the knock at the door," and Swearingen says there was something said about the bell. He talks in much the same way to Miskelly and others on this matter; but there is some confusion as to whether he said that he and his wife were in the room when the door was shoved, or when Mrs. Mc-Wha told them that some one had shoved the door. At any rate, this matter of these ladies being there seems pressing on and haunting his mind, and he talks very much about it. Does it spring from the fact that he was in the house at that time? The jury must have thought so. Samuel Ralston states that he saw Baker and a woman, and a man or men—he is indefinite as to number—in the orchard near the three-cornered lot about 2 o'clock Tuesday. He made to several persons inconsistent statements about this, and, besides, he says this was before his talk with Gardner, a defence witness; and Gardner saw, in the orchard, Baker, his wife, and one or two men, near said lot a little after 1 o'clock, and just afterwards talked with Ralston. We can not be called on to consider Ralston's, Grimes', and the child Keagy's evidence, under the above rules, after a jury has passed on it. Undoubtedly, there were three men walking on the premises with Baker—the three men that rented the stable. Those three men, to whom Baker would attribute the deed are mysterious, mythical men. No one saw them go to or from Mrs. McWha's, though workmen were numerous in the vicinity. Baker states that his wife told them in his presence that an agreement of lease would be ready for them when they returned ; yet he did not take their names. Whence they came, whither they went, what their names,

though he was asked, he does not tell. Though they paid $10.00 rent in advance, they never returned. If strangers were the actors in the tragedy, it is strange that they left a gold watch, a silver watch, silver table and tea spoons, gold finger-rings, ear-rings, necklace, and cross untouched. It may be that Baker takes the presence of White, Nelson, and Davidson, who did rent the stable, and on it builds the fabrication of a second party of three men there for another purpose. This is an expedient sometimes resorted to by guilty men. Wills, Circ. Ev. 83.

It does not seem that any valuables were taken, except Baker's. Some papers of his were found, some time after, under Lee's fence. On the day of the discovery of the murder, James Campbell sees him near this fence, slowly walking towards it. Baker says $350,00 of his money was taken from a pocket-book. It is notable that he tells this to Mrs. Knox early after the discovery, Tuesday morning. Did he desire to impress the point that he, too, was a sufferer? While all bureau drawers and trunks were ransacked and rummaged, as if in eager search for valuables, two drawers in different bureaus were untouched, their contents remaining nicely packed. What did they contain? Clothes of the little baby boy of Baker and Eliza, about a year old, who died in January before the murder, their only child, born when his father was in distant Minnesota, and dying when he was still there. Would strangers have exempted these drawers? Would they have known what might be in them? The upper part of his trunk was disturbed, but the lower part contained his laundried and unlaundried clothing, and other things, and was not rummaged. Crawford, on Tuesday, got the trunk key from Baker, and inserted it in the lock; found it unlocked, but the hasp fell. Baker says he had that day, before this, unlocked it.

How came there three weapons—axe, pin, and coupler? Was it to tally with the claim that three men did the deed? No wound was found to suit the coupler. The written lease of the stable, which had been prepared for Flinn, *alias* Mudd, to execute, but which he did not execute, was changed to suit the names of White, Nelson, and Davidson; and a few minutes after he left home, at the station, he stated he

had been detained by attending to business for the women; had transferred the Flinn article to those men, and that detained him, and made him hurry for the train. There is no dispute that this changing the article from Flinn's name to others took place near 12 o'clock; yet later he tells people that it was leasing the lot to the unnamed men that detained him.

It is a circumstance not without some import that on his way to the station he looked to Knox as if he had been working—his face flushed—and passed close without speaking—an unusual thing, they being intimate; and that he took a longer route to the station, and did not pass by Brown's where the buggy and Mrs. Brown and Mrs. Swearingen were, they having returned from their unsuccessful visit to Mrs. McWha's, but passed perhaps 500 yards from Brown's.

The fact that the kitchen door was unlocked when Mrs. Swearingen was there is urged by the prisoner's counsel in an able brief in his behalf, and has considerable force. In a certain sense, it seems incredible that he should be working such a deed with the door unlocked. But it might have been forgotten. If he was there when that door-bell rang—rang twice, the second time with stronger sound, importing that the comer was bent on getting in, and Baker's bloody task yet unfinished—what would have been his emotion and consternation?

> "Whence is that knocking?
> How is't with me, when every noise appals me?
> What hands are here! Ha! they pluck out mine eyes!
> Will all great Neptune's ocean wash this blood
> Clean from my hand?"

"Shall I remain? There comes a second knocking. I will flee to the rear." At the door, he finds Mrs. Swearingen there, and closes it in her face. Or perhaps he had unlocked the door, ready to flee, if necessity or a final conclusion, in his burning quandary, doubt, and anxiety, should call for it. Or perhaps he had the door open, carrying in water. The cistern lid was off next morning—an unusual thing. We can not say just how this was. But this door was found locked by neighbors next morning, and Baker says it was locked, and the key hanging by it, and he could not enter it when he returned the next morning, and entered

the front door.   Who locked it?   If Mrs. McWha locked it
when Mrs. Swearingen was there, still it would not have re-
mained locked all the balance of the long June afternoon.
They would not have locked it until night.   If killed before
night, they would not have locked it.

It is of deep, dark import that the men who rented the
stable told Baker that they would put their horses in it that
night, and Baker followed them to the gate, out of the hear-
ing of his wife and her mother, and told them when they
came, not to come to the house, but go straight to the stable.
Baker went to his father's, expecting to stay until Tuesday
evening, perhaps Wednesday, as he says.   He did not reach
there until night, wet from rain.   He rises at 5 o'clock next
morning, walks four miles to the railroad, and arrives at
Holliday's Cove about 8:30 o'clock.   He told some one at
Hamlin's he had expected to go to Pittsburg, but had for-
gotten something.   He did not say what, nor has he ever
said what.   He had been much accustomed to absence from
home.   Why this hasty return, this rising with the dawn?
He suggests that he thought of there being so many strange
men around his home, making the new railroad, and the
women alone.   If he was the guilty man, the presence of
these strangers would afford a good opportunity for the
commission of the deed, as their presence would suggest the
probability of their agency in it.   If he was guilty, the deed
would sit heavy on his soul, and would bear with leaden
weight upon his mind, giving him no sleep or rest.   He had
left things in such condition he would burn to know the
development.   What is going on at the Cove?   His unrest
would carry him back.   Counsel for the state urges that
what he had forgotten was the making of an appearance of
an entrance by murderers, and that he, upon returning,
made the breach in the window shutter in the parlor.   There
is evidence tending to show that the breach was on the in-
side, and no appearance of a breach from outside.   Counsel
argues that there is much in the fact that Mrs. Brown, though
she noticed that the front blind at the porch was down, did
not notice blood spots on the glass.   She was some feet from
it; merely noticed the blind down.   And it is clear from
several witnesses that there were on the glass but two small

spots, though a great number of spray points on the glass, which it took careful looking to see. Some had to use glasses to see them. It would be difficult to see them, looking casually from without, especially as the blind was down. A somewhat unusual occurrence is this: that as Baker was entering the yard, on his return from his father's, before reaching his home, as he says, Mrs. Swearingen, going home, met him at the gate, and told him to tell his wife that she had called the day before, and was sorry she had not seen her, and Baker did not ask her to go up the short distance to the house and see his wife. He says he did not; did not think of it. If he knew his wife was dead, he would not ask Mrs. S. to go; if he did not, he likely would.

An important question in this cause is were there blood spots on Baker's pantaloons? If there were, that fact, added to the other circumstances, is a potent addition. As above appears, there is a quantity of evidence on this matter, and some about his being seen rubbing his pantaloons. Three microscopists examined them. Dr. McKennon is decided that in seven out of nine spots he found clear evidence of blood—red blood corpuscles. He tested by two processes, microscope and chemicals; one confirming the other. Ewell, in his Medical Jurisprudence, (page 260) says: "Of all tests for blood given in this connection, the discovery of red blood corpuscles by the microscope, and the microspectroscopic examination above described, alone seems to be without fallacy." Prof. Logan tends strongly to confirm this, saying he found strong indications of blood, and his best judgment was that there was blood on the pantaloons, but he wanted to detach corpuscles, to obtain the hæmin crystals of Teichmann; and, as he could not get this absolute test, he would not swear positively to the presence of blood. Dr. Reeves, a witness for the defence, as he could not find hæmin crystals, stated that he found no evidence of blood. As to this test, Ewell, Med. Juris. 248, says: "Teichmann's test has been shown to be liable to considerable uncertainty, for the reason that spots of human blood, or even the fluid itself, in appreciable quantity, may fail to yield any hæmin crystals whatever, or only such as are of so indefinite a character as to be utterly worthless for diagnosis." And,

before .the jury, the evidence of Oliver Lee, that, looking through the jail window, nearly covered with a paper blind, he saw Baker, with his pants off, rubbing them, and, catching Lee's eye, dropped them, and went to reading a newspaper. Under this evidence, might not the jury have thought there was blood on the pantaloons? If he was the murderer, it is most likely that his pantaloon legs would receive blood spots; for the evidence is full that Mrs. McWha's blood spurted and sprayed upon the wall, window, pictures, and floor widely, and there was blood widely scattered in great quantity in the kitchen. And, if he carried his wife's body from the kitchen to the other room, there must have been blood on his clothes.

A vast mass of evidence, a host of witnesses, very many circumstances, were before the jury. The jury heard the long and to me unsatisfactory statement of Baker, and looked into his face, There was much conflict, direct or logical, between his statements or versions and other witnesses; and conflict between other witnesses of state and defence on important matters. On all these matters and conflicts a jury has passed. A chain of evidence, consisting of many circumstances, has been aptly compared to a rope made up of many slender filaments. The rope has strength more than sufficient to bear the stress laid upon it, though no one of the filaments would be sufficient for that purpose. Opinion in *Dean's Case*, 32 Gratt. 928. Where all the circumstances of time, place, motive, means, opportunity, and conduct concur in pointing out the accused as the perpetrator of the crime, it must produce a moral, if not absolute, certainty of his guilt. 1 Stark. Ev. 494; *Dean's Case, supra.* Many of these circumstance, if not all, are present in this case and point to the prisoner. I borrow and approve the language used by Judge CHRISTIAN, in delivering the opinion of the Virginia court in *Dean's Case*: "Numerous witnesses were examined. The evidence is all certified. It is altogether circumstantial. In the very outset two things must he borne in mind—*First*, that circumstantial evidence must always be scanned with great caution, and can never justify a verdict of guilty, especially of murder in the first degree, the penalty of which is death, unless the circumstances proved are of such a

character and tendency as to produce upon a fair and un-
prejudiced mind a moral conviction of the guilt of the
accused beyond all reasonable doubt; but, *secondly,* it must
also be remembered that there are some crimes committed
with such secrecy that to require the production of a witness
who saw the act committed would be to defeat the public
justice, to deny all protection to society, to let the greatest
offenders go free, and the most heinous crimes go unpun-
ished."

This frightful double murder is fit only to be called "a
deed without a name." Seldom do the courts hear the recital
of so bloody a drama, so cruel and heartless a crime. West
Virginia, in her life, has never witnessed its equal within her
borders. May she never see another. If Van B. Baker be
guilty, it ought to be a subject of congratulation that the law,
as an avenging Nemesis, with steady and unerring step, has
followed him to the ultimate judgment that is this day pro-
nounced by this Court.

> "The eye of God,
> Every path by Murder trod,
> Watches, lidless, day and night."

On the other hand, if he be innocent, we can only say
that earthly things are not certain, mistakes may occur in
the administration of justice, and that he is the victim of
error only of the head, not of the heart, and that his country
has thrice heard him for his cause, and been patient that it
might hear. We can, if he is innocent, but lament that
human laws and courts are not infallible, and be satisfied that
his jury did not take his life under the Divine law. "Whoso
sheddeth man's blood, by man shall his blood be shed," but
have left the door open, so that, if his innocence shall be
made certain, reparation may be made unto him, though it
do come late.

We must not be understood as finding fault with the ver-
dict. We can not say that, had we been of the jury, we
would not have found the same verdict. If the prisoner is
guilty, he deserves the highest and sternest penalty of the
law—death; but, as the case was one of circumstantial evi-
dence, the jury likely thought, as there might be a possi-
bility of his innocence, they would not exact his life for the

crime. As for ourselves, we feel no hesitation in saying that it is our plain duty to affirm the judgment, and it is ordered accordingly.

AFFIRMED.

## NOTE BY THE JUDGE.

The record in this case contains 1,105 large pages of print. At least 915 pages are evidence, and 90 examination of jurors, all in the form of questions and answers. Since the advent of stenography in the courts, the practice is prevailing, where there is a motion 'for a new trial because the verdict is contrary to the evidence, or there is an exception to the giving or refusing of instructions, or the admission or rejection of evidence, to adopt simply the stenographer's report of the evidence as a whole, and incorporate it into a bill of exceptions. All the members of the Court desire to embrace the opportunity afforded by this case to condemn and discourage this practice. It renders the record voluminous, irregular, and vague. The cost of the transcript and printing is vastly increased. The public treasury suffers in felony cases, as the printing is at public expense, and to private parties the cost is heavy, sometimes ruinous. It renders the labors of this Court much greater, consuming time badly needed in the discharge of public business. In the case of motions for new trials, the party whose motion is overruled suffers greatly from this practice; for under it all his oral evidence conflicting with his adversary's goes for naught, and his adversary's evidence is given full faith and credit. As long ago as *Bennett* v. *Hardaway,* 6 Munf. 125, and longer, the Virginia court of appeals held that a bill of exceptions to the judgment of the trial court overruling a motion for a new trial on the ground that the verdict is, or is not, warranted by the evidence, should properly, in every case, certify the facts proved, not the evidence. In Virginia and this State that rule has been so often recognized that it seems useless to cite cases to it. It was explicitly approved and sought to be enforced by this Court in *Morgan* v. *Fleming,* 24 W. Va. 186. Yet it is constantly disregarded, and, where stenography is used in the courts, often or generally so. It is in violation of the fourth section of a rule of this Court. 23 W. Va. 818. In *Fawcett* v. *Railroad Co.,* 24 W. Va. 755, this rule is also laid down, and Judge SNYDER, in delivering the opinion, says: "The evidence was * * * taken down at the trial by a stenographer in the form of questions and answers, and thus incorporated in the bill of exceptions. This report of the testimony covers 132 pages of the printed record. The testimony is conflicting, and plainly of a character that precludes this Court from reviewing it, to determine whether it does or does not sustain the verdict of the jury. The only use this Court can possibly make of it would be to ascertain the propriety or impropriety of the rul-

ings of the Court in regard to the allowance or rejection of the evidence and instructions excepted to by the defendant during the trial. The Circuit Court should, therefore, have refused to give any bill of exceptions in this form, but should have certified the facts, if it was intended to have this Court review the case on the question whether or not the verdict was warranted by the facts proved. But, if it was intended merely to have this Court review the rulings of the Circuit Court in regard to the allowance or rejection of evidence or instructions excepted to by the plaintiff in error. then only so much of the evidence or facts should have been certified as would show the relevancy or irrelevancy of the evidence, or the pertinency or impertinency of the instructions excepted to. * * * If, under the settled rule in such cases, all the parol evidence of the plaintiff in error in conflict with that of the defendants in error is rejected, very little of the exceptor's evidence will be left; certainly not enough, upon the most liberal view of it, to justify this Court in holding that the verdict is not sustained by the evidence."

Another positive rule of this Court is that "an exception to the admission or rejection of evidence, or the granting or refusal of instructions to the jury, should state only so much of the evidence or facts proven as may be necessary to show the relevancy or irrelevancy of such evidence, or the pertinency or impertinency of such instruction. The judge of the trial court should require all unnecessary matter to be stricken out before signing a bill of exceptions." 23 W. Va. 818. We are compelled now to deprecate this practice, and to respectfully call the attention of the courts and attorneys to it.

This Court is not the first to complain. Chief Justice BECKLEY, in the Supreme Court of Georgia in *McGee* v. *Long*, 9 S. E. Rep. 1107, uses this language : "Moreover, as to much of this evidence, we are referred by the motion for a new trial to an exhibit annexed to it, to ascertain what the evidence was ; and that exhibit consists of a long rigmarole, apparently a stenographic report of questions, answers, remarks by counsel, remarks and rulings of the court, etc , the evidence being scattered up and down divers pages,. with these irrelevant, tedious, and distracting matters interspersed. That we are not going.to fish up evidence in fragments from such muddy water, we have plainly intimated in *Wiggins* v. *Norton*, 9 S. E. Rep. 607. * * * Other courts are beginning to complain of this nuisance." *Cahn* v. *State*, (Tex.) 11 S. W. Rep. 727.